Design Basics, LLC.

v.

Lexington Homes Inc., et al.

Report submitted by:

Robert Greenstreet

August 2015

# TABLE OF CONTENTS

1. Introduction

    A. Qualifications
    B. Compensation
    C. Scope of Review
    D. Materials Reviewed

2. Do the Design Basics housing models at issue exhibit originality or creativity in their design?

3. Are the challenged housing models of Lexington substantially similar to the designs claimed by Design Basics LLC?

4. Summary.

5. Appendix A: Curriculum Vitae

6. Appendix B: Comparison of Design Basics and Lexington models regarding "substantial similarity"

7. Appendix C: The Generic Layout and Appearance of Design Basics' designs

8. Appendix D: Traditions of design development in the homebuilding industry

9. Appendix E: Recent developments in copyright protection.

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 2 of 117   Document 59-8

# 1. Introduction

## A. Qualifications

I am an architect licensed in the United Kingdom since 1976 and have worked in the United States since 1978. My curriculum vitae is appended to this report (Appendix A). I am currently the Dean of the School of Architecture and Urban Planning at the University of Wisconsin-Milwaukee where I undertake teaching and research into the field of architectural practice and its relationship to the law. I am trained as an arbitrator and mediator and have served as Interim Chancellor of the University of Wisconsin-Milwaukee and Director of Planning and Design for the City of Milwaukee.

## B. Compensation

I am compensated at a fixed rate of $15,000.00 for research, preparation and delivery of the final report. Subsequent involvement in the form of consultation, deposition or trial/hearing attendance is charged at the rate of $380.00 per hour. My compensation for this project is not contingent on the conclusion I reach, or the outcome of this case.

## C. Scope of Review

I have been retained by the law firm acting on behalf of the defendants Lexington Homes Inc., Team Stimpson, LLC., Tailwind Crossings, LLC, Ponds of Menasha, LLC, Fieldstone

3

Investments, LLC, Centennial Center, LLC, Jeffrey T. Marlowe, Michelle I. Stimpson and Greg Wells (hereafter referred to as Lexington) in the case of Design Basics LLC, Prime Designs, Inc. and Plan Pro, Inc., (hereafter referred to as Design Basics) versus Lexington Homes to provide opinions on the issue of whether there is substantial similarity between any of the Plaintiff's housing designs at issue and the defendant's challenged designs; and on the issue of whether there is any originality and creativity exhibited in the Design Basics' designs.

## D. Materials Reviewed

With regard to the case of Design Basics v Lexington, I have reviewed the following documents:

Materials from the Design Basics' website concerning:

The Aspen

The Kendrick

The Womack

The Ashwood

Plaintiff's Complaint for Copyright Infringement

Lexington brochure materials concerning the models at issue:

The Carlisle

The Oakridge

4

The Easton

The Ashwood


Plaintiff's Objections and Responses to Acuity's First Request for Production of Documents

Plaintiff's Objections and responses to Acuity's First Interrogatories

Plaintiff's First Amended Objections and Responses to Defendant Lexington Homes, Inc.'s First Set of Interrogatories

Plaintiff's Objections and Responses to Defendant Lexington Homes, Inc.'s First Set of Interrogatories

Plaintiff's First Amended Objections and Responses to Defendant Lexington Homes Inc.'s First Request for Production

Plaintiff's Objections and Responses to Defendant Lexington Homes Inc.'s First Request for Production

## 2. Do the Design Basics' housing models at issue exhibit originality or creativity in their design?

In order to address this question from an architectural perspective, it is useful to describe the background of the Architectural Works Copyright Protection Act 1990 (AWCPA), its intention in protecting original, creative work and its limitations. The models named in the Complaint and claimed by Design Basics all bear Certificates of Copyright Registration issued by the United States Copyright Office under the auspices of the AWCPA, and each application to receive copyright protection was made on the assertion that each design was original, not derivative of other existing work, and therefore worthy of copyright protection. For the purposes of this report, it is assumed that the Design Basics' designs at issue were the same as those submitted to the United States Copyright Office when application for copyright registration was originally made.

The AWCPA was originally developed to protect original, creative expression, which can be defined architecturally as the protection of artistic building features that are original to their creator, not derived from any pre-existing work and that precede all others in time. The Act is not quantifiably specific in determining a measurable scale of originality, and only requires a minimal level of originality and creativity. However, there must still be some evidence that originality and creativity exists to warrant copyright protection, either in the component elements of the design, or in their assembly or arrangement, and sufficient design development of the

6

elements (both individually and collectively) to ascertain originality beyond a high level of

generality that may be little more than an overall concept and not a meaningful expression of a

new idea.

In the absence of quantifiable, measurable criteria, there will always be an element of subjective

judgment that must be applied to a design from an architectural perspective to determine if any

originality exists. Such judgment should be applied to the 'protectable elements' or aspects of

each design that, in the case of Design Basics, have not been identified by the Plaintiff to date.

In the absence of any indication as to which elements of the work are claimed to be protectable

under the Act, it is first necessary to establish what the Act does not cover and what is

specifically excluded from copyright coverage.  Any remaining aspects of the work can then be

examined for creativity and originality to determine which aspects, if any, are legitimately worthy

of copyright protection. This is particularly important in the case of modestly priced, relatively

small design work such as the Design Basics' housing models in question.  Due to the modest

nature of their size and program, these Design Basics models display relatively few building

components in each home design to consider from the perspective of copyright merit, and any

similarities to other home designers may be based solely on the traditional (i.e. pre-existing,

long established, standard, conventional), and therefore non-original elements and their

arrangement rather than any level of original, creative expression.

In order to try to focus copyright protection on deserving, original work, the Act specifically

excludes building elements that are necessary for construction and so generic and

commonplace as to be considered universal in their application, both at the time of application

for protection and in any previous or subsequent usage. These include traditional relationships

of spaces or rooms (such as bedroom to master bathroom, or kitchen to dining room). Secondly,

the Act excludes building elements that would normally be considered functionally necessary,

such as walls, doors, roofs and windows. These are elements that are considered to be

utilitarian by necessity and are fundamental to the structure and building enclosure of each

design. While an original and creative arrangement of such elements may be potentially

protectable, the constituent elements themselves are not.


Thirdly, the Act does not cover standard architectural features and design elements, such as

columns, molding, gables or window frames, which are considered to be part of a much

broader, traditional architectural vocabulary in the public realm and therefore universally

available to all designers. Again, an original and creative arrangement of these elements may

potentially merit copyright protection, but the constituent components, if they display no

indication of originality, do not.


Collectively, these three categories of exemption can significantly reduce the components of a

building that may be claimed as protectable, especially in the small scale, modestly priced

8

housing field. For example, functional elements are going to be determined by the building's primary purpose, which is to provide a habitable, residential environment. Each building needs to incorporate provisions for adequate shelter from the elements, and include conditions necessary for habitability, such as heat, cooling, ventilation and light. Such features that are integral to these functions, such as walls, windows, doors and roofs, cannot exist independently of their basic utilitarian function and, as these elements constitute a major proportion of any basic house, the opportunity for creating original, creative expression, even at a minimal level, is limited. Doors and windows, for example, have to punctuate walls to provide light, ventilation and access. Roofs are often pitched to create optimum weather protection, a conventional strategy that largely determines the physical appearance and the overall massing, or shape, of each building. These features and arrangements alone greatly determine the visual appearance of most modestly sized housing units.

Furthermore, absent any original, creative design elements such as unique architectural details or unusual features not normally associated with reasonably priced, traditional housing stock (non-traditional combinations of building materials, for example, or original elements such as creatively conceived balconies, stairways or roofing configurations), an alternative argument for copyright protection may lie in the original arrangement of spaces, rooms or other elements within a building. Again, in a relatively simple house, this is difficult to achieve. The typical market rate house has relatively few rooms that, by virtue of their individual domestic function,

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 9 of 117   Document 59-8

tend to be arranged in traditional relationships to meet user needs and market demand. There are certain relationships of rooms and spaces that, over time, have proven to be the most logical, effective and desirable from a consumer perspective.

For example, in two story homes, there is often a powder room on the first floor and larger bathrooms on the second floor close to the bedrooms, where the largest, or master, bedroom is served by an accompanying bathroom. Dining rooms/areas and breakfast spaces are situated adjacent to kitchens, while living rooms are located to provide prominent views of outside landscaping. Garages, if they are integral, often connect to the main house through a mudroom, utility room or kitchen and so on. By the time the basic relationships are established and fitted within the three dimensional shell of the house, there are few opportunities for originality and creativity that might deserve copyright protection without significant budgetary additions, which are unusual in the highly competitive and largely traditional housing market. Certainly, the simple manipulation of conventional rooms and spaces into a predictable, arrangement evidenced in countless other housing prototypes over the years does not usually entail an original outcome unless there is some minimal level of originality and creativity in the arrangement. This is particularly evident in modestly priced, modestly sized housing where conventional, traditional solutions are if anything prized over innovation by consumers.

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 10 of 117   Document 59-8

After careful examination, it is my opinion that no demonstration of any such originality or creativity is evident in any of the Design Basics' models in question, either in the design as a whole or in their constituent elements or the arrangement, selection or composition of those elements.

The combined consequence of collectively considering these three exclusion categories – functional requirements, traditional configurations of space and standard architectural details – provides a much clearer indication of any remaining originality and, as previously stated, will be particularly noticeable in smaller buildings such as those in the modestly priced housing sector where Design Basics operates. Here, cost, code requirements and consumer preference will further limit the scope of design alternatives. Given the size and small number of rooms, there are relatively few components and therefore a limited number of plan layouts and appearances possible. This reality necessarily limits the number of potentially original design opportunities. Once the basic spatial arrangement of rooms has been set, the functional elements required to make the building habitable, and any standard architectural features included, it becomes challenging to specifically identify any elements, or combination or arrangement of elements that can accurately be described as original or creative.

As established above, in order to enjoy copyright protection under the AWCPA, it is necessary to establish a minimal level of originality and creativity, a difficult task in the housing market at

11

issue. This is not to say that originality cannot be successfully demonstrated and copyright protection legitimately earned. However, it is usually achieved at the higher value end of the housing market where, in individual, single family homes, factors such as adequate budget, client preference, larger unit size and greater engagement of architectural expertise provide more opportunity for the exploration and inclusion of creative elements or arrangements. It is much less common in the more economically priced realms of the housing market where budgets are significantly smaller, consequent building size and programs are more restrictive, and where client demand is likely to be more conventional and skewed towards the traditional. In this market, it is also less likely for professionally trained, licensed architects to be involved in the design process. A review of any property section in any local newspaper, Parade of Homes or suburban housing website will reveal very little variation in housing styles, and very little originality in individual units. (Appendix C diagrammatically illustrates the simple, generic principles in both plan and elevation of the Design Basics' models in question. Specifically, it demonstrates how the Design Basics' models have a very similar generic layout and appearance to many other designs produced throughout the country). Such housing units are doubtless functional, economical, and habitable. They successfully anticipate and meet consumer demand in a market where individuality and originality are less prized, but instead fall squarely into the category of conventional, traditional housing that neither attempts to be nor can legitimately be described as original or creative.

In the case of the Design Basics portfolio, a review of the work at issue reveals a range of conventional housing alternatives. Specifically, the models in question contain no evidence of creative expression or originality, especially when they are viewed in the necessary absence of functional requirements, traditional arrangements of spaces and standard architectural features. The models, which fall squarely into the category of conventional, modestly priced housing, are generated by basic, functional and economic restrictions and a desire to create traditional, predictable and recognizably conventional housing solutions (which are often self-described on the Design Basics' website as 'traditional' – not a term usually associated with innovation) which satisfy market acceptability and demand. Consequently, it should not be surprising that so many designs in both Design Basics' portfolio and in the work of other housing companies look familiar (see Appendix C). They share a common generic background in both layout and appearance that is embedded in a traditional vocabulary that was pre-existing before copyright protection or the advent of the AWCPA. Traditional homes similar to the Design Basics' designs can be seen in publications and on websites created by homebuilders across the country, where modest similarities are expected when works draw extensively from pre-existing information readily available in the public realm (see Appendix D). For example, based upon a review of readily available published materials containing housing designs, it is clear that pre-existing publications (such as, for example, The Plan Book series published by Robert Fillmore and Associates - now The Fillmore and Chambers Design Group - since 1980) contain designs that share plans and housing appearances similar to those claimed by Design Basics. In Appendix C, the 'bubble' diagrams showing the simple, generic layout and appearance of each of the

13

Design Basics' models demonstrates the wide range of similar layouts and appearances of comparable, generic homes that exist, and have long existed, across the country. This raises the issue as to whether the designs of Design Basics may themselves have been derived from existing sources, given the similarities to existing designs. This would challenge the claim for originality that was used as a basis for copyright registration and, when taken in conjunction with the exclusion of functional elements, traditional spatial arrangements and standard architectural features, renders any copyright protection unsupportable.

The Design Basics' models at issue, while displaying no elements or combination of elements that could be regarded as original, have their origins firmly rooted in the past, in the pool of existing design arrangements commonly associated with the housing market. The layouts of each model contain a conventional array of rooms and spaces, predictably arranged and consistent with housing alternatives seen in housing markets across the country for many years. The massing of the houses, their material construction and architectural details are conventional choices that reflect traditional housing solutions that conform to the expectations of market rate housing. The 'style' of the models reviewed, most of which Design Basics prominently advertises as 'traditional', are consistent with the understanding that the word implies. This confirms the conclusion that they are in keeping with the long-standing style or custom and are congruent with long-established standards and conventions of house design in both plan and appearance.

14

Therefore, it is my opinion that the Design Basics' models at issue contain no expressions of originality or creativity either in their building elements or in the arrangement, selection or composition of these elements, or in their overall form. Instead, each unit conforms to an expected formula of traditional rooms and spaces that are conventionally arranged and predictable in appearance, and are comparable to the products of many other housing competitors across the country. In this respect, their recognition and marketing of the style of many of their models as 'traditional' and all that the word implies, is entirely accurate.

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 15 of 117   Document 59-8

## 3. Are the challenged housing models by Lexington substantially similar to the designs claimed by Design Basics LLC ("Design Basics")?

I have reviewed the Design Basics' home designs at issue. Each design on their website is accompanied by descriptive text that outlines, among other things, the style, number and use of each room and the overall dimensions and square footage of each house. I have reviewed comparable materials from Lexington of the models in contention.

The following lists each Design Basics' model at issue and the corresponding accused homes built by Lexington. In each case, I compared the designs to determine if there was substantial similarity that might infer that the Lexington model was copied from or derived from the Design Basics model:

| DESIGN BASICS | LEXINGTON |
| --- | --- |
| Aspen | Carlisle |
| Kendrick | Oakridge |
| Womack | Easton |
| Taylor | Ashwood |

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 16 of 117   Document 59-8

A collective review of the comparisons listed above indicates that none of the Lexington designs are exact copies of the Design Basics' models, and that none of the Lexington designs are in any way directly copied by either electronic or manual means from the Plaintiff's work.

It is apparent that significant and sufficient differences exist between the Design Basics and Lexington designs to disprove any claim that one was used directly to create the other. The drawings, when viewed together in association with the actual dimensions listed on each set of plans, display such a variation of overall building size, individual room dimensions and spatial relationships as to disprove any claim that the Design Basics' materials were directly copied, traced over or reproduced to create the Lexington designs. Furthermore, no correlation of major external walls or interior walls exists that would indicate direct copying.

The question of whether one set of drawings influenced the other, or more specifically whether there is 'substantial similarity' between the two sets of designs requires greater scrutiny. Given their similar building programs, dimensions and market niche within the housing market, they are likely to conform to generally accepted expectations in both layout and appearance and not appear markedly different from many other builders competing in the same market (see Appendix C).

A detailed comparative analysis of the plans and associated information (see Appendix B), in addition to demonstrating no correlation in actual dimensions, sometimes shows a certain similarity in room juxtapositions, but only within the normally expected parameters of residential

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 17 of 117   Document 59-8

construction. For example, bedrooms are close to bathrooms and closets, and kitchens are close to breakfast or dining spaces. The Design Basics' plans display no original spatial layouts or arrangements of spaces beyond standard configurations of spaces which are not protectable under the Architectural Works Copyright Protection Act (see Section 2 of the report) and no indication of substantial similarity beyond basic layout characteristics anticipatable between comparable housing contractors working in the same housing market, albeit in different states.

Similarly, the massing and appearance of the various pairs of designs analyzed do not reveal any substantial similarities. There are sufficient differences in appearances of the compared models to demonstrate no direct copying and no substantial similarities exist beyond the expected, conventional palette of building materials and traditional façade compositions that are predictable in this sector of the housing market.

When collectively assessed, a comparison of the Design Basics' models to those created by Lexington reveals many differences. In addition to differing room dimensions and overall square footage, there are further examples of different design features in each of the sets of drawings compared. These range from differences in the overall massing of the homes caused by contrasting roofing configurations (see Appendix B list on how Lexington's Carlisle differs from Design Basics' Aspen), to overall building footprint, square footage and appearance (see Appendix B list of how Lexington's Ashwood differs from Design Basics' Taylor).

18

There are also many indications of the use of different building materials, particularly on the exteriors of the compared models, which change the appearance of the homes (see Appendix B list of how Lexington's Easton differs from Design Basics' Womack. In addition, many examples can be found of differing building details, such as windows, porches, garage doors and other details around doors and eaves. (See all lists in Appendix B for numerous examples.)

The many differences in square footage, individual room dimensions, building massing, roofing configurations, building appearance, building materials and building details articulated in Appendix B support the conclusion that none of the models of Design Basics and Lexington listed at issue are substantially similar. To the extent that Design Basics' comparisons attempt to claim substantial similarity, any such similarities exist only at the level of standard, traditional and non-original elements and their arrangement, not at the level of any creative, original expression.

In summary, the findings of this section of the report confirm that the analysis of the models in dispute disprove any suggestion of direct copying of any of the Design Basics' designs, and furthermore no evidence exists of substantial similarity between the designs claimed by Design Basics and those created by Lexington. It is clear that Lexington did not directly copy any of the Design Basics' designs, and that any comparability between the models in question is due to the kind of commonalities in building type, building size and building spatial arrangement and

19

appearance that is to be expected within this traditional sector of the housing industry. Such layouts, room arrangements and appearances have existed in the market long before copyright protection was enacted, and reflect how elements are organized in predictable, conventional spatial configurations that are commonplace in comparable, utilitarian buildings.

Despite general similarities normally anticipatable in the traditional and conventional housing market, still many differences exist between the models claimed by Lexington and those owned by Design Basics in terms of their respective square footage, dimensions, plan layouts, massing, use of materials and appearance that reject the notion of substantial similarity.

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 20 of 117   Document 59-8

## 4. Summary

The findings of this report confirm that the evidence disproves any suggestion of direct copying

of any Design Basics' designs at issue, and that there is no substantial similarity between the

Design Basics' models and those created by Lexington. It is clear that Lexington did not directly

copy any of the Design Basics' designs and that any comparability between the models in

question is due to similarities in building type and program, building size, room arrangement and

general appearance that have been traditionally used in the housing industry long before

copyright protection existed. When compared directly, the models owned by Lexington and

Design Basics demonstrate many differences in their respective sizes, dimensions, plan layouts,

massing, use of materials and appearance that reject the notion of substantial similarity.

It is also my opinion that the Design Basics' models at issue contain no expressions of

originality or creativity, either in the design as a whole, in the building elements used or in the

arrangement, composition or selection of the building elements. Instead, each Design Basics'

plan at issue conforms to an expected formula of traditional rooms and spaces conventionally

laid out and predictable in appearance, similar to countless other housing units built across the

United States for years prior to the enactment of the AWCPA.

Signed:

Date:   12 August 2015

22

# APPENDIX A

## Curriculum Vitae

CURRICULUM VITAE

1       Robert Charles Greenstreet, Ph.D., R.I.B.A. Dip.Arch (Oxford). F.R.S.A.

2       <u>GENERAL INFORMATION</u>

2.1     <u>Education</u>

        Department of Architecture, Oxford Polytechnic (now Oxford Brookes University)

        1970 – 74              Part One RIBA Examination Exemption (B.A. Equiv.)
        1974 – 75              Part Two RIBA Examination Exemption
        1976                   Awarded Diploma in Architecture (Oxford)
        1978                   Part Three RIBA Examination Exemption
        1976 – 78              Ph.D. Studies undertaken in the Post Graduate Research
                               School, Department of Architecture, Oxford Polytechnic.
                               Thesis entitled: "Investigation and Analysis of the Building
                               Control Process."
                               Doctorate awarded May 1983

        <u>Professional Licenses</u>

        1978                   Architectural License (Registration Number 045098G),
                               Architects Registration Board, United Kingdom

2.2     <u>Continuing Education</u>

        Fulfillment of mandatory annual continuing education requirements in Architecture,
        Arbitration and Mediation. Available on request.[*]

2.3     <u>Positions Held</u>

2.3.1   <u>Professional</u>

        Work undertaken on a full-time or part-time basis in the following offices:

        1972                   Hildebrand and Glicker, London.  (Redevelopment of office
                               accommodation, London).

---

[*] This document is formulated according to the requirements of the Professional Division of the University of
Wisconsin-Milwaukee. Certain sections have been removed from this curriculum vitae for the sake of brevity, but are
available on request.

| | |
|---|---|
| 1972 – 73 | W.G. Rymills and Partners, Witney, Oxfordshire. (Residential commercial and ecclesiastical work). |
| 1975 | B. Hubble and Partners, Wantage, Berkshire. (Renovation, commercial and residential work). |
| 1977 – 78 | Gray and Baynes, Oxford. (University, school and residential work). |
| 1981 – | Consulting Practice, Milwaukee, Wisconsin, involving arbitrations, mediations, expert witness work and consultation with architects, engineers, contractors and lawyers. Several small scale design projects undertaken 1988-present. |

2.3.2    Academic

| | |
|---|---|
| 1976 – 78 | Lecturer, Department of Architecture Oxford Polytechnic (Part-time). |
| 1976 – 78 | Lecturer, Department of Town Planning, Oxford Polytechnic (Part-time). |
| 1978 – 79 | Visiting Assistant Professor, Department of Pre-Design Professions, College of Architecture and Design, Kansas State University. |
| 1979 – 80 | Assistant Professor, School of Architecture and Urban Design, University of Kansas. |
| 1980 – 81 | Adjunct Assistant Professor, University of Kansas (London Program). |
| | Lecturer, Graduate Research School, Oxford Polytechnic (Part-time). |
| | Visiting Professor, College of Architecture and Planning, Ball State University (Winter quarter). |
| 1981 – 85 | Assistant Professor, Department of Architecture, University of Wisconsin-Milwaukee. |
| 1983 – | Assistant Scientist, Urban Research Center, University of Wisconsin-Milwaukee. |
| 1985 | Promoted to Associate Professor with Tenure. |

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 25 of 117   Document 59-8

| 1985 – 86 | Assistant to the Vice Chancellor, University of Wisconsin-Milwaukee. |
|---|---|
| 1986 – 90 | Chair of the Department of Architecture, University of Wisconsin-Milwaukee. |
| 1987 – 90 | Member of the University Committee, University of Wisconsin-Milwaukee, the seven-person Executive Committee of the Faculty (Vice-Chair and Newsletter Editor). |
| 1990 | Promoted to Professor. |
| 1990 – | Dean, School of Architecture and Urban Planning. |
| 1993 – 2004 | Commissioner, Milwaukee Plan Commission. |
| 1995 – 96 | President, Association of Collegiate Schools of Architecture. |
| 1998 – 2004 | Chair of the Milwaukee Plan Commission. |
| 1999 – 2001 | Interim Dean, School of the Arts, University of Wisconsin-Milwaukee (dual appointment). |
| 1999 – 2005 | Chancellor's Deputy for Campus and Urban Design, University of Wisconsin-Milwaukee. |
| 2003 – 2004 | Interim Chancellor, University of Wisconsin-Milwaukee. |
| 2004 – 2009 | Director of Planning and Design, City of Milwaukee (dual appointment). |
| 2009 - | Chair of City Development, UWM/City of Milwaukee. |

2.4     Percentage of Assigned Load Devoted to Teaching

100% administrative load since 1986, although at least one course taught each year on overload in the Department of Architecture (Fall semester, Introduction to Building Technology; Spring semester, Law and Professional Practice for Architects). More detailed teaching history available on request.

3       SCHOLARLY AND CREATIVE ACTIVITIES

3.1     Articles & Papers

This section has been divided into three categories or groupings. The first deals with
articles written in the field of architectural law, the area of research concentration, the
second contains articles concerned with more general aspects of architecture and the third
with fiction.

3.1.1   Articles: Architectural Law

Articles in this subsection are divided into three groups. The first contains articles written
for Progressive Architecture, a professional journal with an international circulation of
75,000 and the reputation as the most circulated architectural journal in the world prior to
its demise in 1995. I was one of three regular contributors and each article was reviewed
by the editorial board twice, at outline stage and completed paper stage. The second group
of articles has been published in other American journals with either regional, national or
international distribution, while the third contains articles written for journals published in
the United Kingdom.

3.1.1.1 'Progressive Architecture' Articles

1   Greenstreet, R. "Law: Who Really Owns Your Design?" Progressive Architecture,
    April 1985, pp. 63-66.
    (editorial board, international distribution)

2   Greenstreet, R. "Legal Liability in Perspective," Progressive Architecture, March
    1986, pp. 55-60.
    (editorial board, international distribution)

3   Greenstreet, R. "The Architect/Client Relationship," Progressive Architecture, July
    1986, pp. 63-72.
    (editorial board, international distribution)

Reprinted as:

4   Greenstreet, R. "The Architect/Client Relationship," Architects and Surveyors
    Institute Yearbook, 1990. pp. 176-177.

5   Greenstreet, R. "Information: The Architect & the Law," Progressive Architecture,
    December 1986, pp. 100-101.
    (editorial board, international distribution)

6   Greenstreet, R, "Survival Strategies for the Small Firm," Progressive Architecture, April 1987, pp. 67-74.
    (editorial board, international distribution)

Reprinted as:

7   Greenstreet, R. "Survival Strategies for the Small Firm," Connecticut AIA Newsletter, July 1987.
    (editorial staff, regional distribution)

8   Greenstreet, R. "Law-Liability Insurance," Progressive Architecture, August 1987, pp. 57-60.

9   Greenstreet, R. "Arbitration and Mediation," Progressive Architecture, May 1988, pp. 53-56.
    (editorial board, international distribution)

10  Greenstreet, R. "Law: Licensing Precautions," Progressive Architecture, November 1988, pp. 53-60.
    (editorial board, international distribution)

11  Greenstreet, R. "Architectural Ethics," Progressive Architecture, July 1989.

12  Greenstreet, R. "Bidding and Selection," Progressive Architecture, December 1989, pp. 49-57.

13  Greenstreet, R. "After Accepting the Bid," Progressive Architecture, December 1990, p. 53.

14  Greenstreet, R. "Getting Paid," Progressive Architecture, June 1990, pp. 55-57.

15  Greenstreet, R. Hubbard, N. "Collecting Fees," Progressive Architecture, September 1990, p. 65.

16  Greenstreet, R. "Construction Specification," Progressive Architecture, November 1991.

17  Greenstreet, R., Hubbard, N. "Keeping Records," Progressive Architecture, June 1992.
    (Progressive Architecture ceased publication in 1995)

3.1.1.2   Other American Journals

1   Greenstreet, R. "The Architect and the Building Contract—Knowing Your Stuff," Wisconsin Architect, October 1982, pp. 20-27.

2  Greenstreet, R. "Planning Ahead in the Architect/Client Relationship," <u>Wisconsin Architect</u>, November 1983, pp. 15-17.

3  Greenstreet, R., Weinstein, A. "The Legal Implications of Utilizing Solar Energy Systems in Architecture," <u>Wisconsin Architect</u>, June 1984, pp. 9-13.

4  Greenstreet, R., England, E. "Architectural Ethics—Where Do We Go From Here?" <u>Wisconsin Architect</u>, July 1984, p. 2.

5  Greenstreet, R. "Limitation of Liability," <u>The Wisconsin Architect</u>, August 1985, pp. 19-22.
   (editorial board, regional distribution)

6  Greenstreet, R. "Legal Liability and the Architect in Wisconsin," <u>The Wisconsin Architect</u>, August 1986, pp. 21-23.
   (editorial board, regional distribution)

7  Greenstreet, R. "Liability Burden Hits Architect," <u>Corporate Report</u>, May 1987, pp. 34-35.
   (editorial staff, regional distribution)

8  Greenstreet, R. "Architectural Education: Integration of Law and Practice into the Curriculum," <u>Architectural Record</u>, March 1987, p. 43.
   (editorial board)

9  Greenstreet, R. "Hidden Determinants of Urban Form," <u>Urbanism 2</u>, No. 2, Spring 1988, pp. 4-9.
   (editorial board, national distribution)

10 Greenstreet, R. "The Pitfalls of Slander Laws," <u>Architecture</u>, February 1989, pp. 103-04.
   (editorial board, national distribution)

11 Greenstreet, R. "The Law and the Habitability of the City," <u>Making Cities Livable Newsletter</u>, Vol. 3, No. 1, March/December 1991.

12 Greenstreet, R. Review of "Law in Urban Design and Planning," (Van Nostrand Reinhold 1989), by R. Lai, <u>Journal of Architectural Education</u>, August 1989.

13 Greenstreet, R. "The Expert's Role in Construction Disputes," <u>The Punch List</u>, Vol. 18, No. 2, Summer 1995, pp. 7-8.

14 Greenstreet, R. "The Impact of Building Codes and Legislation Upon the Development of Tall Buildings." <u>Architronic: The Electronic Journal of Architecture</u>, Vol. 5, No. 2, September 1996.

15  Greenstreet, R. "The Case for Copyright: Protecting Originality and the Architect's Rights of Ownership," AIA Architect, March 1998.

Reprinted as:

16  Greenstreet, R. "The Case for Copyright: Protecting Originality and the Architect's Rights of Ownership," Wisconsin Architect, May/June 1998, pp. 34.

17  Greenstreet, R., Klingaman, R. "Architectural Copyright: Recent Developments in Protecting Originality and the Architect's Right of Ownership." Architectural Research Quarterly, Cambridge University, England. Vol. 4, No. 2, 2000, pp. 177-183.

18  Klingaman, R., Greenstreet, R. "Will Architectural Works Law have a Chilling Effect?" The National Law Journal, 19 March 2001.

19  Greenstreet, R. "When Legal Liability Looms—What to do First." Licensed Architect, Vol. 6, No. 2, 2002, pp. 14-15.

20  Greenstreet, R. "Solving Disputes—Is There an Easier Way?" Wisconsin Architect, Vol. 73, Issue 2, 2002, pp. 16-17.

21  Greenstreet, R. "Getting the Edge," Licensed Architect, Vol. 7, No. 1, 2003, pp. 22-23.

Reprinted as:

22  Greenstreet, R. "Getting the Edge," Wisconsin Architect, Vol. 74, Issue 1, 2003, pp. 17-19.

23  Greenstreet, R. "Defending Against Claims of Copyright Infringement: The Expert Witness Perspective," Wisconsin Civil Trial Journal, Fall 2005.

Reprinted as:

24  Greenstreet, R. "Defending Against Claims of Copyright Infringement: The Expert Witness Perspective," Inews—the IP Experts Newsletter, 2006, pp. 7.

25  Greenstreet, R. "The Myth of Originality," Licensed Architect, Vol. 11, No. 2, 2007, pp. 15-16.

26  Greenstreet, R. "Working With an Expert Witness: A Lawyer's Guide," Messenger, Summer 2010, Vol. 2, pp. 10-19.

27  Greenstreet, R. "The Architect as Expert Witness: A Survival Guide," Licensed Architect, Vol. 14, No. 4, Winter 2010, pp. 34-36.

28  Greenstreet, R. "Choosing an Expert Witness in Construction Cases," Articles Base, July 18, 2011.

29  Greenstreet, R. "Design Copyright Protection and the Architecture Profession: Has it Worked?" Licensed Architect, Vol. 16, No. 4, Winter 2012, pp. 43-44.

30  Greenstreet, R. "Has the Architectural Works Copyright Protection Act Worked? An Architect's Perspective," The Messenger, Winter 2012.

Winner of the 2013 Messenger Award for Excellence in Journalism.

32  Greenstreet, R. "Bridging the Town/Gown Divide," ACSA News, March 2013.

31  Greenstreet, R. "The Value of Architects in Alternative Dispute Resolution," Licensed Architect, Summer 2014.

32  Greenstreet, R. "Architects in Dispute Resolution: Do They Make Good Arbitrators and Mediators?" The Messenger, Summer 2014.

### 3.1.1.3   English Journals

1  Greenstreet, R. "The Trouble with Building Control Officers," IBCO, The Journal of the Institution of Building Control Officers, Vol. V, No. 2, Issue No. 18, Summer 1978, pp. 114-17.

2  Greenstreet, R. "Revise the Regs," The Architects' Journal, Vol. 167, No. 19, May 10, 1978, pp. 899-900.

3  Greenstreet, R. "An Historical Perspective," IBCO, Journal of the Institution of Building Control Officers, Vol. VI, Issue No. 23, Autumn 1979, pp. 8-9.

4  Greenstreet, R. "The American Style," IBCO, Journal of the Institution of Building Control Officers, Vol. VII, No. I, Issue 25, Spring 1980, pp. 12-13.

5  Greenstreet, R. "Building Regulations, The Cloud with the Silver Lining," Portico, The Journal of the Faculty of Architects and Surveyors, Vol. LXXXIV, No. 2, Summer 1980, p. 224.

Reprinted as:

6  Greenstreet, R. "Building Regulations—A Historic Overview," The Building Official and Code Administrator, March/April 1981, pp. 22-24.

7  Greenstreet, R. "Codes of Conduct—American Style," Portico, The Journal of the Faculty of Architects and Surveyors, Vol. LXXXVI, No. 4, Winter 1982, pp. 15-16.

8    Greenstreet, R. "Building Regulations—Where Now?" Building Design, No. 513, September 19, 1980, pp. 52-53.

Reprinted as:

9    Greenstreet, R. "Out of the Frying Pan," Portico, The Journal of the Faculty of Architects and Surveyors, Vol. LXXXIV, No. 4, Winter 1980, pp. 36-37.

10   Greenstreet, R. "Recent Developments in Design Ownership: The American Perspective," Portico, The Journal of the Faculty of Architects and Surveyors, Vol. LXXXIX, No. 1, Spring 1985, pp. 8-9.
     (editorial board, national distribution)

Reprinted as:

11   Greenstreet, R. "Design Ownership: The American Perspective," Architects' Journal, June 5, 1985, pp. 91-92.
     (editorial board, international distribution)

12   Greenstreet, R. "Practice 2: The U. S. Perspective," The Architect, June 1986, pp. 15-16.
     (editorial board, international distribution)

13   Greenstreet, R. "Centralization in the Building Control Process and Some Possible Benefits to the Participatory Process," Open House International, Vol. 11, No. 2, 1986, pp. 58-65.
     (editorial board, international distribution)

14   Greenstreet, R. "The Allowance of Unnecessary Evidence—A Potential Factor in the High Cost of Arbitration," Arbitration, Vol. 2, No. 2, May 1996, p. 113.


3.1.2    Articles: General Aspects of Architecture

1    Greenstreet, R. "Oxford, History of a University Town," Flint Magazine, February 21, 1979.

2    Greenstreet, R. "Construction and the Architect—the American Approach," Portico, The Journal of the Faculty of Architects and Surveyors, Vol. LXXXVII, No. 1, Spring 1983, pp. 9-10.

3    Greenstreet, R., Gersich, J. "UW-M Students Design a 'Real-Life' Project," Wisconsin Architect, May 1983, pp. 24-26.

4    Greenstreet, R. "Energy Conservation in the United States," Portico, The Journal of the Faculty of Architects and Surveyors, Vol. LXXXVII, No. 2, Summer 1983, p 41.

5  Greenstreet, R., Ryhn, D. "Building Conservation in the United States," Portico, The Journal of the Faculty of Architects and Surveyors, Vol. LXXXVII, No. 4, Winter 1983, pp. 23-25.

6  Greenstreet, R. "Efficient Information Sharing: The Development of an Information File," Representation, the Journal of Graphic Education, Vol. 1, Issue 1, Autumn 1984, pp. 8-9.

7  Ryhn, D., Greenstreet, R. "SARUP and Community Development," The Wisconsin Architect, August 1985, pp. 25-26.
   (editorial board, regional distribution)

8  Greenstreet, R. "Competition and Restraint" (letter). Royal Institute of British Architects Journal, November 1985, p. 15.
   (editorial board, international distribution)

9  Greenstreet, R., Wirth, H. "Campus Jewel," The Wisconsin Architect, June 1986, pp. 6-10.
   (editorial board, regional distribution)

10  Shields, J., Greenstreet, R. "Architectural Representation: Techniques of the Past," Representation, The Journal of Graphic Education, Vol. 3, Issue 3, Summer 1986.
    (editorial board, national distribution)


Reprinted as:

11  Shields, J., Greenstreet, R. "Architectural Representation: Techniques of the Past," Wisconsin Architects, August 1987.
    (editorial board, regional distribution)

12  Lohne, M. (text by Shields, J., Greenstreet, R.) "Top Ten Buildings in Wisconsin," Exclusively Yours, November 1987.
    (editorial staff, local distribution)

13  Greenstreet, R. "A Serious Attempt at Utopian Landscape," Wisconsin Architect, April 1989.
    (editorial board, regional distribution)

14  Greenstreet, R. "Studying Architecture in the USA," Transworld Education, Vol. 3, Issue 4, 1995, pp. 76-78.

15  Greenstreet, R. "Bridging the Practitioner-Educator Divide," AIA Architect, Vol. 2, November 1995, p. 16.

Reprinted as:

16  Greenstreet, R. "Bridging the Practitioner-Educator Divide, Wisconsin Architect, February 1996.

17  Greenstreet, R., Widom, C., Rhinehart, R. "All in the Family: The Profession and Academia," AIA Architect, Vol. 2, December 1995, p. 20.

Also published as:

18  Greenstreet, R., Widom, C., Rhinehart, R. "All in the Family: The Profession of Architecture and Academia," ACSA News, Vol. 25, No. 4, December 1995, pp. 3-7.

19  Greenstreet, R. "The Adjunct Issue," ACSA News, Vol. 25, No. 6, February 1996, pp. 1-3.

20  Greenstreet, R. "Architectural Education and the Liberal Arts," ACSA News, Vol. 25, No. 7, March 1996, pp. 2-3.

21  Greenstreet, R. "President's Message," ACSA News, Vol. 25, No. 8, April 1996, pp. 1-3.

22  Greenstreet, R. "Faculty Development Update," ACSA News, Vol. 25, No. 9, May 1996, pp. 1-4.

23  Snyder, G., Greenstreet, R. "The Painstaking Attention That is Crucial to Good Architecture," Connector, Vol. V, No. 1, Spring 1996, pp. 2-3.

Reprinted as:

24  Snyder, G., Greenstreet, R. "The Painstaking Attention That is Crucial to Good Architecture," Connector, Vol. IX, No. 1, Spring 2000 (Part of the Past 5 Years Issue).

25  Greenstreet, R. "Bridging the Practitioner-Educator Divide Revisited," AIA Architect, June 1997.

Reprinted as:

26  Greenstreet, R. "Bridging the Practitioner-Educator Divide Revisited," Wisconsin Architect, September/October 1997, pp. 26-27.

27  Greenstreet, R. "Service Not Included? Balancing Teaching, Research and Service," UWM Faculty Mentoring Program, Vol. 1, Issue 1, November 10, 1997, pp. 2 and 7.

Reprinted as:

28  Greenstreet, R. "Service Not Included? Balancing Teaching, Research and Service with a Smile," ACSA News, Vol. 28, No. 2, October 1998, p. 4.

29  Greenstreet, R. "The Dean's Top Ten," Wisconsin Architect, Vol. 70, Issue 1, 1999, p. 79.

30  Greenstreet, R. "Interview with the Dean," Wisconsin Architect, Vol. 71, Issue 1, 2000, pp. 75-76.

31  Greenstreet, R. "Big City Architecture," Issue, Vol. 2, No. 1, Fall 2001, pp. 47-48.

32  Greenstreet, R. "Keeping the Momentum Going," Wisconsin Architect, Vol. 73, Issue 1, 2002, p. 64.

33  Greenstreet, R. "The Town/Gown Divide—Taking the University into City Government," Design Intelligence, April 2006, Vol. 12, No. 4, p. 9.

34  Greenstreet, R. "The School/Practice Divide: Innovative Strategies Creating Value in Graduates," Design Intelligence, April 2006, Vol. 12, No. 4, p. 7.

35  Greenstreet, R. "Architecture Schools in the Community: The Collaboration Boon of Architecture Programs with Local Practice and Industry," Design Intelligence, April 2006, Vol. 12, No. 4, p. 15.

36  Greenstreet, R. "Bridging Milwaukee's Town and Gown Divide," Strategies, The Newsletter of the City Planning and Management Divisions of the American Planning Association, Fall 2006.

37  Greenstreet, R. "Intelligent Design for a Great City," (Editorial) Milwaukee Journal, April 17, 2008.

38  Greenstreet, R. "A 10-Point Survival Guide To Being, and Staying, an Academic Leader," Part 1 Faculty Focus, March 3, 2010 (E-Newsletter).

39  Greenstreet, R. "A 10-Part Survival Guide to Being, and Staying, an Academic Leader," Part 2 Faculty Focus, March 5, 2010 (E-Newsletter).

40  Greenstreet, R. Journal Sentinel, (invited editorial), September 19, 2010.

## 3.1.3   Articles: Fiction

1  Greenstreet, R. "A Change of Plan," Kansas City Catchword, October 1979.

2   Greenstreet, R. "Perfection," Pterodactyl's Egg, September 1980.

3.1.4   Exhibitions

1   Watercolors and design work exhibited at
- Marion Hall, University of Kansas
- Haggerty Art Museum, Marquette University and various exhibitions and shows in Kansas City and Milwaukee

3.2   Books

1   Porter, T., Greenstreet, R. The Manual of Graphic Techniques (Charles Scribner's Sons, New York 1978). The book has now been published in five languages.

2   Greenstreet, R. Legal and Contractual Procedures for Architects (Architectural Press, London 1981).
    First Edition 1981
    Second Edition 1984
    Third Edition 1989
    Fourth Edition 1994 (with D. Chappell)
    Fifth Edition 2003 (with D. Chappell & M. Dunn)

3   Greenstreet, R. Graphics Sourcebook (Prentice Hall, New Jersey 1984).

4   Greenstreet, R., Greenstreet, K. The Architect's Guide to Law and Practice (Van Nostrand Reinhold, New York 1984).

5   Greenstreet, R., Shields, J. Architectural Representation (Prentice Hall, New Jersey 1988).

6   Witzling, L., Greenstreet, R. Presenting Statistics—Communicating Quantitative Information Effectively (J. Wiley, Interscience, New York 1989).

7   Greenstreet, R., Greenstreet, K., Schermer, B. Law and Practice for Architects (Architectural Press, Elsevier, 2005).

3.3   Books and Handbooks: Contributions

1   Encyclopedia of Architecture: Design, Engineering and Construction (Editor J. A. Wilkes), Chapter on Arbitration (John Wiley & Sons, New York 1988).

2   Ollswang, J., Witzling, L. Competitions Handbook (Prepared under a grant from NEA 1986). Consultant on legal aspects of competitions.

3   Rabinowitz, H. Post Occupancy Evaluation (Van Nostrand Reinhold 1988).
Consultant on legal aspects of the text and author, Appendix A.
(The book received a Citation in the 36th Annual P/A Awards Program.)

4   Pressman, A. Architecture 101 (Van Nostrand Reinhold 1993). Section on
Presentation Techniques.

5   Pressman, A. The Fountainheadache: The Politics of Architect-Client Relations
(J. Wiley and Sons 1995).

6   Pressman, A. Curing the Fountainheadache: How Architects and Their Clients
Communicate, 2nd Edition (Sterling Publishing Co., New York 2005).

7   Pressman, A. Professional Practice 101: A Sourcebook of Business and
Management Strategies in Architecture (John Wiley and Sons 1995), and
extended/updated chapter for Second Edition 2005.

8   Greenstreet, R. "The Role of the Expert Witness in Construction-Related Disputes:
Problems and Pitfalls," The Commercial Way to Justice, (Kluwer Law Publishers,
Kluwer Law International, The Netherlands 1997).

9   Greenstreet, R. "The Design Profession and the Law," Chapter 30 in Ozolins, P. and
Knox, P. Design Professional and the Built Environment: An Introduction (John
Wiley Ltd. New York, 2001).

10   Pressman, A. The Architect's Portable Design Handbook, (McGraw Hill, New York,
2001), Chapter entitled "Presenting for Pros," coauthor Karen Greenstreet.

11   Greenstreet, R. The Oxford Polytechnic Graphics Handbook, (Oxford Polytechnic,
1978). Prepared under a grant from the Departments of Architecture and Town
Planning, Oxford Polytechnic.

12   Greenstreet, R., Malecha, M. The Junior Faculty Handbook. Association of
Collegiate Schools of Architecture. 1st Edition 1994
2nd Edition 2009

13   Greenstreet, R. (editor) The New Administrators' Handbook. Association of
Collegiate Schools of Architecture, 1st Edition 1994.
2nd Edition 1996
3rd Edition 1998
4th Edition 2000
5th Edition 2002
6th Edition 2005
7th Edition 2008
8th Edition 2010

14   Editor, The Architect's Handbook of Professional Practice—Student Edition, (American Institute of Architects, 2001)

15   Greenstreet, R. (co-editor) (with D. Haviland et al), Instructor's Guide to the Architect's Handbook of Professional Practice, Eleventh Edition (American Institute of Architects, earlier 1988).

16   Preiser, W. Improving Building Performance, (National Council of Architectural Registration Boards, 2003).

17   Schermer, B., Greenstreet, R. "Bidding and Contract Negotiation," Emerging Architects Companion, An online training manual published by the American Institute of Architects, 2004.

18   Schermer, B., Greenstreet, R. "Bidding and Contract Negotiation," Emerging Architects Companion, American Institute of Architects, Second Edition, 2007.

19   Greenstreet, R. "The Impact of Building Codes and Legislation on the Development of Tall Buildings" (originally published in Architronic: The Electronic Journal of Architecture 1996), in Bach, Joanna, Gdansk Study of High Rise Development, Polish Ministry of Infrastructure, 2008.

20   Greenstreet, R. "Creating a Town/Gown Partnership: The Milwaukee Model," Chapter in Kapp, P. and Armstrong P. SynergiCity: Reinventing the Post Industrial City (to be published by University of Illinois Press, 2012).

## 3.4     Research Reports

1   Greenstreet, R., Smith, I. "An Evaluation of the Post Graduate Course in Architecture," Oxford Polytechnic 1976. Funded by a grant from the Department of Architecture, Oxford Polytechnic.

2   Greenstreet, R. "Recommendations for a Building Control System in Western Samoa," (Report requested by the government of Western Samoa 1979).

3   Hamdi, N., Greenstreet, R. (editors) "Participation in Housing No. 1: Theory and Implementation," Working Paper No. 57. Department of Town Planning, Oxford Polytechnic, October 1981.

4   Hamdi, N., Greenstreet, R. (editors) "Participation in Housing No. 2: The Legal and Administrative Framework," Working Paper No. 58. Department of Town Planning, Oxford Polytechnic, November 1981.

5   Hamdi, N., Greenstreet, R. (editors) "Participation in Housing No. 3: Two Case Studies," Working Paper No. 59. Department of Town Planning, Oxford Polytechnic, January 1982.

6   Greenstreet, R. "The Impact of Building Controls. Paper Two in Participation in Housing No. 2: The Legal and Administrative Framework," Working Paper No. 58 (editors N. Hamdi, R. Greenstreet) Department of Town Planning, Oxford Polytechnic, November 1981.

7   Greenstreet, R. "Investigation and Analysis of the Structure of the Building Control Process," Post-Graduate Research School, Oxford Polytechnic, Ph.D. Thesis submitted and accepted, May 1993.

8   Greenstreet, R. (editor) "Proceedings of the Annual Meeting," ACSA West Central Region, 1984.

9   Greenstreet, R. "Legal Impacts Upon the Profession of Architecture: The Liability of the Architect in Wisconsin," Department of Architecture and Center for Architecture and Urban Planning Research, University of Wisconsin-Milwaukee, 1985.

10  Greenstreet, R. (editor) Proceedings of the ACSA Special Focus Session, Law and Practice in Architecture Group, Association of Collegiate Schools of Architecture Annual Conference, Miami 1988.

11  Greenstreet, R., Page, W. "A Conceptual Master Plan for the Jones Valley," University of Wisconsin-Milwaukee, June 1989.

12  Greenstreet, R. (editor) Proceedings of the ACSA Special Focus Session, Law and Practice in Architecture Group, Association of Collegiate Schools of Architecture Annual Conference, Chicago 1989.

13  Greenstreet, R. "Feasibility Study for a New School of Architecture," Florida Atlantic University, 1995.

14  Greenstreet, R. "Law and Regulations in Architecture," Center for Architecture and Urban Planning Research Working Paper #95-3, November 30, 1995.

15  Program Appraisal of the Proposed Bachelor of Science Degree Program in Architecture, New Jersey Institute of Technology, November 1996.

16  Greenstreet, R. "Renovation and Expansion of the Karl Jewish Community Center: A Planning Proposal Review," 2002.

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 39 of 117   Document 59-8

3.7     Research

3.7.1   Research Grants Received

        Available on Request

3.7.2   Projects Conducted, Grants Received and Funds Raised

        Available on Request.

3.8.1   Reviews of Books in 3.2.1

| | | |
|---|---|---|
| 1 | The RIBA Journal | August 1980 |
| 2 | Building Design | December 5, 1980 |
| 3 | The Architects' Journal | July 1, 1981 |
| 4 | The RIBA Journal | July 1981 |
| 5 | Q.S. Weekly | September 24, 1981 |
| 6 | Municipal Building Management Volume 4 | 1981 Issue |
| 7 | The Architect and Surveyor | October/November 1981 |
| 8 | What's New in Building | February 1982 |
| 9 | Q.S. Weekly | July 8, 1982 |
| 10 | Wisconsin Society of Architects | June 1984 |
| 11 | Architecture | August 1984 |
| 12 | Architecture | September 1984 |
| 13 | Architect's Journal | October 27, 1984 |
| 14 | Building Design | July 1989 |
| 15 | Designer's Journal | February 1990 |
| 16 | Building Design | December 1990 |
| 17 | Journal of Architectural and Planning Research | Fall 1991 |
| 18 | AIA Architect | July 1995 |

3.8.2   Newspaper Interviews

        Numerous interviews in the Milwaukee Journal Sentinel and other Wisconsin journals.
        Others include New York Times, Wall Street Journal, Denver Post, the London Times and
        El Pais.

        Available on request

3.8.3    Radio and Television Interviews

Includes hosting a radio show and appearances on NPR, Chicago Public Radio, Wisconsin Public Radio, WUWM and local television stations.

Regular monthly appearances on Lake Effect, WUWM, 2007 – 2013.


3.9      Papers Published in Conference Proceedings

1    Greenstreet, R. "The Impact of Building Codes Upon Architectural Expression," Proceedings of the Annual Conference, ACSA West Central Region, University of Washington, St. Louis, Missouri, 1985.

2    Greenstreet, R. "Building Codes as a Determinant of Building Identity," Proceedings of the Annual Conference, ACSA West Region, Washington University, Pullman, Washington, 1985.

3    Greenstreet, R. "Legal Impacts Upon the Advancement of Technology," Paper presented at the Annual Conference, ACSA Technology Conference, Washington, D.C., 1985.

4    Greenstreet, R. "The Architectural Practice in the Corporate World: Conflicts of Professionalism and Incorporation," Proceedings of the Annual Conference, ACSA East Central Region, Miami University, Ohio, 1986.

5    Greenstreet, R. "Hidden Determinants of Urban Form," Proceedings of the Annual Conference, ACSA Annual Conference, Los Angeles, 1987. (Published in Urbanism, Spring 1988.)

6    Greenstreet, R. "Impacts of Legislation Upon the Provision of Shelter in Developing Countries," Proceedings of the World Congress Union Internationale des Architects XII, Brighton, England 1987.

Also accepted as:

7    Greenstreet, R. "Impacts of Legislation Upon the Provision of Urban Shelter in Developing Countries," Published Abstracts of the International Conference on Urban Shelter in Developing Countries, London, England, 1987.

8    Greenstreet, R. "Public Space and the Realm of Law-Legal Determinants of Common Ground," Proceedings of the West Central ACSA Regional Conference, Iowa, October 1987.

9    Greenstreet, R. "Dilemmas in Architectural Education: The Concept of Professionalism," Proceedings of the West Regional ACSA Regional Conference, Oregon, October 1987.

18

10  Greenstreet, R., Keegan, K. "Civic Miniatures," Proceedings of the Small Town Chautauqua, Mississippi State University, October 1987.

11  Greenstreet, R. "An Approach to Public Service," Paper presented at the Association of Collegiate Schools of Architecture Administrators' Conference, Washington, November 1987.

12  Greenstreet, R. "Infusion of Innovation in Materials and Technology Development into the Construction Process," Paper presented at the Association of Collegiate Schools of Architecture Technology Conference, San Francisco, February 1988.

13  Greenstreet, R. "The Impact of Building Codes and Legislation upon the Development of Tall Buildings," Proceedings of the Fourth International Conference on Tall Buildings, Hong Kong, May 1988.

14  Greenstreet, R. (editor) Proceedings of ACSA Special Focus Session, Law and Practice in Architecture Group, Association of Collegiate Schools of Architecture Annual Conference, Miami 1988.

15  Hubbard, N., Greenstreet, R. "Conflicts of Practice and Pedagogy: The Integration of Law and Practice into the Curriculum" Published Abstracts of the ACSA Southwestern Regional Conference, Arlington, Texas, October 1988.

16  Keegan, K., Greenstreet, R. "Material Suitability and Selection in the Design Process," Published Abstracts of the ARCC Research Conference, Champaign-Urbana, Illinois, November 1988.

17  Greenstreet, R., Patton C. "Public Service and the Value Concept," Proceedings of the Academic Chairpersons Annual Conference, Orlando, Florida, February, 1989.

18  Greenstreet, R. "The Architect as Perceived in Popular Culture," Published Abstracts of the Popular Culture Association Annual Meeting, St. Louis, Missouri, April 1989.

19  Greenstreet, R. "Understanding the Urban Fabric: The Implications of Legal Prescription on the Habitability of the City," Making Cities Livable Conference, Venice, Italy, July 1989.
Paper published in Making Cities Livable Newsletter, Vol. 3, No 1, March/December 1991.

20  Greenstreet, R. "Tenured Faculty Development," ACSA Administrators' Conference, Phoenix, 1990.

21  Hubbard, N., Greenstreet R. "The Illinois Debate: The First Licensing Statute," (Society of Architectural Historians, 1990).

22 Greenstreet, R. "The Architect's Image: Improving Public Awareness through an Increased Understanding of the Development of the Profession's Role in Society," (International Union of Architects, XVIIth Congress, Montreal, 1990).

23 Greenstreet, R. "Evaluating the Urban Structure: How Law Affects the City," (Culture, Space & History International Conference IAPS II, Ankara, 1990).

24 Hubbard, N., Greenstreet, R. "Architecture in the Eyes of the Law: Towards a Quantifiable Definition of Architectural Practice," (Association of Collegiate Schools of Architecture National Meeting, San Francisco, 1991).

25 Greenstreet, R. "The Architecture/Law Interface: The Continual Blurring of the Boundaries," (The Second CSPA Symposium on Architectural Practice/Fifth International and Interdisciplinary Forum on Built Form and Culture Research, Cincinnati, 1993).

26 Greenstreet, R. "A Review of Current Legal and Ethical Frameworks for Post-Occupancy Evaluation," (Abstract published as part of symposium) Proceedings of Environmental Design Research Association Annual Meeting (EDRA 25) San Antonio, Texas, 1994.

27 Greenstreet, R. "Forming the Urban Context: Towards a Better Understanding of the Forces That Determine the Fabric of the City," Proceedings of the ACSA European Conference, London, 1994.

28 Greenstreet, R. "Understanding the Urban Experience," (International Association for People-Environment Studies, IAPS 513, Manchester, England, 1994).

29 Greenstreet, R. "Understanding the Urban Experience: The Role of the Building Regulatory Process in Shaping the City," Proceedings of the International Association for People-Environment Studies Conference (IAPS 13) Manchester, England, 1994.

30 Greenstreet, R. "Pursuing the Urban Mission: The Inner City Experience," Proceedings of the ACSA European Conference, Lisbon, Portugal, 1995.

31 Greenstreet, R. "The Allowance of Unnecessary Evidence—A Potential Factor in the High Cost of Arbitration," Proceedings of the Annual Conference, Chartered Institute of Arbitrators, London, July 1996.

32 Greenstreet, R., Snyder, G. "New Directions in Architectural Education: An Integrated Approach to Building Construction in the Curriculum." Proceedings of the ACSA European Conference, Copenhagen, Denmark, May 1996.

33 Greenstreet, R. "The Role of the Expert Witness in Construction-Related Disputes: Problems and Pitfalls." Proceedings of the International Arbitration Conference, Boston, September 1996. (Now published in book form by Kluwer Law Publishers– see 3.3.7.)

34 Greenstreet, R. "Architectural Education and the Liberal Arts," published in the Proceedings of the Architectural Education and Liberal Arts Symposium, Drury College, January 1996.

35 Greenstreet, R. "Intellectual Property in the Digital Age: Conflicts of Ownership and Accessibility in the Physical Environment," Technology, Knowledge and Society, Bilboa, Spain, 2011.

36 Greenstreet, R. "Urbanity and the Law: An examination of key forces and dynamics that propel urban change," Spaces and Flows, An International Conference on Urban and Extra Urban Studies, Prato, Italy, 2011.

37 Greenstreet, R. "An examination of the optimum attributes of a building control system that ensures health and safety in a rapidly urbanizing world," 8th International Conference on Interdisciplinary Social Sciences, Prague, Czech Republic, 2013.

38 Greenstreet, R. "The University and the City: Fusing the academic and political worlds within the urban framework to positively inform, influence and enrich the planning process and urban development," Space and Flows, An international Conference on Urban and extra Urban Studies, Amsterdam, Netherlands, 2013.

## 3.13 Other Publications

1 Keegan, K., Greenstreet, R. Designs for Saukville (University of Wisconsin-Milwaukee 1984). Prepared under a grant from the Village of Saukville and the First National Bank, Port Washington, Wisconsin.

2 Greenstreet, R. Visions of the Future (University of Wisconsin-Milwaukee 1985). Prepared under a grant from the City of Port Washington, Wisconsin.

3 Greenstreet, R. Student Work. A booklet of work produced by students of the Department of Architecture, University of Wisconsin-Milwaukee, 1987.

4 Greenstreet, R., Ryhn, D. (Guest Editors) Wisconsin Architect. August 1988 and July 1989.

5 Greenstreet, R. (with D. Jaeckels) SARUP Student Projects. A booklet produced to commemorate the twentieth anniversary to the School of Architecture and Urban Planning, 1989.

6   Greenstreet, R. Alumni Work. A booklet of work produced in conjunction with the 1989 Alumni Open House Exhibition.

7   Greenstreet, R. The SARUP Honor Code. School of Architecture and Urban Planning, University of Wisconsin-Milwaukee, 1994-2003.

8   Snyder, G., Greenstreet, R. The Image and the Word—Writing Across the Curriculum. School of Architecture and Urban Planning, University of Wisconsin-Milwaukee, 1995.

9   Greenstreet, R. SARUP in the City. University of Wisconsin-Milwaukee, 2009.

10  Greenstreet, R. SARUP in the City 2. University of Wisconsin-Milwaukee, 2010.

11  Greenstreet, R. SARUP in the City 3. University of Wisconsin-Milwaukee, 2011.

12  Greenstreet, R. SARUP in the City 4. University of Wisconsin-Milwaukee, 2012.

4       TEACHING

4.1     Instruction in Classroom, Laboratory, Studio or Chair

        Available on request

4.1.2   Innovations in Teaching:

4.1.2.1  New Courses

        Graphics for Planners                                    (Oxford Polytechnic 1976-78)
        An introductory course for graduate level planning students to give them a basic
        understanding of graphic tools, affects and implementation, including photography and
        exhibition techniques, culminating in three Polytechnic-wide exhibitions of work.

        Architectural Journalism                                (University of Kansas 1979-80)
        An attempt to develop theoretical abilities of architectural students in relation to their
        subject and to provide them with the skills necessary to communicate them in a variety of
        written formats (essay, article, interview). Offered jointly with the School of Journalism,
        University of Kansas.

        Advanced Presentation Techniques   (University of Wisconsin-Milwaukee 1985-present)
        An intensive course covering a broad range of media including a series of graphic
        exercises to sharpen students' graphic skills and knowledge of the appropriate application
        of various techniques.

        Introduction to Building Technology  (University of Wisconsin-Milwaukee 1990-present)
        A sophomore level course exploring basic building construction as a prerequisite for entry
        into the architectural program in the junior year.

        The Madison Studio                          (University of Wisconsin-Madison 1996)
        An exploratory architectural course for liberal arts undergraduates and high school students
        in the Madison area (with Professors Snyder, Rabinowitz and Dicker).

        Architectural Options             (University of Wisconsin-Milwaukee 1998-present)
        A new course developed with Professor H. Rabinowitz that introduces sophomores to the
        many varied professional pathways that exist in the construction world of architecturally
        educated individuals.

4.1.2.2    Legal Aspects of Architecture

Practice & Management in Architecture    (Oxford Polytechnic 1976-78)
A new diploma level course which addressed some of the more problematic aspects of
English architectural practice. This has now formed the focus of an emphasis area within
the curriculum.

Law & the Architect, Planner & Engineer in Private Practice(University of Kansas 1979-80)
A Graduate course developed with a lawyer/planner for design professionals concentrating
on the legal structure of private practice.

Law and Practice for Architects    (Ball State University and
University of Wisconsin-Milwaukee 1980-present)
An introductory course for graduate and undergraduate students exploring the legal
liability of the design professional and the administrative procedures involved in office
practice.

Advanced Law and Practice for Architects (University of Wisconsin-Milwaukee 1984-85)
Building upon the introductory course, this syllabus concentrates on the more detailed
aspects of construction law, while expanding the student's knowledge of office practice
and procedures.

4.1.2.3    Studios

I have taught numerous studios with total control of content, and therefore a wide range of
exercises have been developed at various levels in the curriculum. In some of these,
projects of a participatory nature were developed and have led to exhibitions and
publications which have spurred neighborhood and town activity.

In team-taught situations, I have coordinated a number of studios and have introduced a
number of new projects into them.

4.1.2.4    Architectural Tours and Study Abroad

| | |
|---|---|
| 1979 | Graduate/Undergraduate Intersession Course to Oxford, England (Kansas State University). |
| 1986 | Organizer, Royal Institute of British Architects Tour of Milwaukee. |
| 1988 | Organizer, Wisconsin Architects Study Tour to London, England. |
| 1988 | Co-organizer, Study Abroad Program in Oxford, England (University of Wisconsin-Milwaukee). |

| 1997 | Tour Guide, UWM Chancellor's Mission to London, England. |
| 2000 – | Architectural Tours of Milwaukee for UWM Alumni Association. |
| 2002 – 05 | Guest Guide, SARUP London/Paris Summer Program. |
| 2006 | Alumni Tour of London and Paris. |
| 2007 | Student Overseas Program, London Component. |
| 2009 | Behind the Scenes in London and Paris Alumni Tour. |
| 2009 + 13 | Student Overseas Program, London Component. |
| 2010 | Student Overseas Program, London Component. |
| 2012 | Winterim program to London and Paris. |
| 2013 | London and Paris UWM Alumni Tour. |
| 2014 | Student Overseas Program, London Component. |

### 4.1.3    Student Supervision

As Chair and subsequently Dean of the School, students come for advice on planning their academic lives, although much of the burden is taken by the Student Counseling Office and the Chairs of the BSAS, M.Arch and Ph.D. Committees. I typically serve on a number of Master's Thesis Committees per semester, have been an advisor or reader on 10 Ph.D. theses and occasionally have independent studies undertaken under my direction.

### 4.1.4    Evaluations

Available on request

5     SERVICE

5.1     Membership or Leadership in Departmental, School, College or University Committees (UWM only)

5.1.1     Department of Architecture:

| | | |
|---|---|---|
| 1 | 1983 – 86 | Curriculum and Appointments Committee (Chair, 83-84) |
| 2 | 1981 – 82 | Admissions Committee (Acting Chair, summer 82) |
| 3 | 1981 – 82 | Exhibitions Committee (Chair) |
| 4 | 1982 – 83 | Visiting Lectures Committee |
| 5 | 1984 | Ad Hoc Grievance Committee |
| 6 | 1983 – 84 | Faculty Search Committee |
| 7 | 1984 – 85 | Faculty Search Committee |
| 8 | 1984 – 86 | Research Policy Committee |
| 9 | 1984 | Studio Sequencing Subcommittee |
| 10 | 1984 – 85 | Grievance Officer, Department of Architecture |
| 11 | 1985 – 86 | M.Arch Committee |
| 12 | 1986 – 90 | As Departmental Chair, sit ex-officio on the Ph.D. Committee, M.Arch Committee, B.S.A.S. Committee, Planning and Coordinating Committee and External Affairs Committee. |
| 13 | 1986 – 89 | All Search and Screen Committees (7) |

5.1.2     University:

| | | |
|---|---|---|
| 14 | 1982 – 85 | Scholastic Appeals Committee, Graduate School (Chair) |
| 15 | 1983 – 85 | Graduate Course Committee |
| 16 | 1984 – 86 | ROTC Task Force (Chair) |
| 17 | 1983 – 86 | Faculty Senator |
| 18 | 1985 – 86 | Nominations Committee |
| | 1985 – 86 | Academic Planning Committee |
| | | Committee on Contagious Diseases |
| | | Faculty Development Grant Committee (Chair) |
| | | Academic Staff Professional Development Committee |
| | | Board of Visitors: Task Force on Internationalization |
| | | Board of Visitors: Task Force on Outreach |
| | | Task Force on Foreign Teaching Assistants (Chair) |
| | | Minority Internship Committee |
| | | ROTC Task Force III |
| | | Personnel Advisory Committee |
| | | Committee for Women's Opportunities |
| | | Vacation and Sick Leave Committee |
| | | Academic Staff Titles and Compensation Group |
| | | Enrollment Projection Committee |
| | 1986 – 87 | Personnel Department Evaluation Committee |

|  | Search and Screen Committee, Assistant Chancellor for Student Affairs |
|---|---|
|  | Search and Screen Committee, Assistant to the Chancellor for Equal Opportunity and Affirmative Action |
|  | Academic Planning Committee |
|  | Faculty Senate |
|  | Foreign Teaching Assistant Committee (Chair) |
| 1987 – 88 | Business/Fine Arts Building Committee (Chair) |
|  | Search and Screen Committee, Assistant Chancellor for University Relations |
|  | Nominations Committee |
|  | UWM Foundation Advisory Committee |
|  | State Employees Combined Campaign (Coordinator) |
| 1988 – 89 | University Committee (Executive Committee of the Faculty Senate) (Vice Chair) |
|  | Minority Affairs Council |
|  | Physical Environment Committee |
|  | University Committee Newsletter (Editor) |
| 1989 – 90 | All-University Campaign Committee |
|  | Facilities Design Advisory Council |
|  | Faculty Advisory Committee for International Studies and Sub-Committee, Search and Screen for Director of ISP |
|  | Building Committee: |
|  | Engelmann Hall |
|  | Business Administration Building |
|  | School of Architecture and Urban Planning Building |
|  | Bolton Hall |
| 1990 – 91 | Chancellor's Budget Advisory Committee |
|  | Search and Screen Committee, Dean of Fine Arts, x 2 |
|  | Writing Across the Curriculum Advisory Committee |
|  | Post Tenure Review and Development Committee (Chair) |
|  | Distinguished Academic Staff Review Committee |
| 1991 – 92 | Gender Equity Task Force |
|  | Percent for Art Committee |
|  | UWM Women's Mentoring Program and Advisory Group |
| 1993 – 94 | Academic Planning Committee |
|  | Chancellor's Budget Advisory Committee |
|  | Percent for Art Committee |
|  | Faculty Development Committee |
|  | Writing Across the Curriculum Committee |
|  | Facility Design Committee |
|  | Integrated Coordinators Committee |
|  | Interdisciplinary Research Committee |
| 1995 – 96 | Search and Screen Committee, Dean of College of Engineering |
|  | State Employees Combined Campaign (Co-Chair) |
|  | Open House Planning Committee |
|  | Investment Subcommittee, UWM Foundation |
|  | Faculty Academic Planning and Budget Committee |

|  | Three Deans' Task Forces (faculty development, role of the chairs, telemarketing) |
| 1996 – 97 | Physical Environment Committee |
|  | Accreditation Review Committee |
|  | Search and Screen Committee, Chancellor |
|  | Faculty Academic Planning and Budget Committee |
|  | Design Review Committee |
|  | Mentoring Program Advisory Board |
|  | Open House Committee |
|  | Collegium Society (Chair) |
|  | All-University Campaign Committee |
|  | State Employees Combined Campaign (Co-Chair) |
|  | Chancellor's Budget Advisory Committee |
| 1997 – 98 | Search and Screen Committee, Chancellor |
|  | Physical Environment Committee |
|  | North Central Association Accreditation |
|  | Focused Evaluation Committee |
|  | Faculty Academic and Budget Advisory Committee |
|  | Chancellor's Budget Advisory Committee |
|  | Collegium Society (Chair) |
|  | SECC Committee (Co-Chair) |
|  | Open House Committee and Auction |
|  | Facility Design Committee |
|  | Faculty Mentoring Advisory Committee |
| 1998 – 99 | Physical Environment Committee |
|  | Facility Design Committee (Chair) |
|  | Mentoring Program Advisory Board |
|  | Collegium Society (Chair) |
|  | Auction Committee |
|  | Preview Night Committee |
|  | Open House Planning Committee (and Trolley Coordinator) |
|  | Inauguration Committee |
|  | SECC Committee (Co-Chair) |
|  | Search and Screen Committee, Foundation Director |
|  | Milwaukee Idea Strategy Group |
|  | Campus Design Solutions, Milwaukee Idea (Action Team Leader) |
|  | Commencement Speaker |
| 1999 – 2000 | Facilities Design Committee (Chair) |
|  | Mentoring Program Advisory Committee |
|  | Collegium Society (Chair) |
|  | Chancellor's Auction (Auctioneer) |
|  | Open House Committee and Trolley Coordinator |
|  | Physical Environment Committee |
|  | Academic Deans' Council |
|  | Task Force on the Status of Women |
|  | Milwaukee Idea Strategy Group |
|  | Campus Design Solutions (Action Team Leader) |

28

|  | Chancellor's Cabinet |
| 2000 – 01 | Campaign Committee |
|  | Dean's Council |
|  | UWM Open House |
|  | Milwaukee Idea Strategy Group |
|  | Physical Environment Committee (Chair) |
|  | Status on the Task Force of Women |
|  | UWM Gives to UWM and Auction |
|  | Collegium Society (Co-Chair) |
|  | Faculty Mentoring Program Advisory Committee |
|  | Foundation Review Committee |
|  | Facilities Design Committee (Chair) |
|  | Chancellor's Cabinet |
| 2001 – 02 | The Chancellor's Cabinet |
|  | The Dean's Council |
|  | Physical Environment Committee (Chair) |
|  | Facilities Design Committee (Chair) |
|  | Mentoring Advisory Committee |
|  | Open House Committee (Trolley Czar) |
|  | Auction Committee (Auctioneer) |
|  | Collegium Society (Co-Chair) |
|  | Search and Screen Committee, Vice Chancellor |
|  | for Development |
|  | Search and Screen Committee, Neighborhood |
|  | Liaison Specialist |
|  | Campus Design Solutions (Director) |
|  | Regent's Planning Committee, Exhibition and Conference |
|  | Dean's Council, Aging and the Community |
|  | Alumni Association Tours: Milwaukee Architecture |
|  | and River Tour |
| 2002 – 03 | Chancellor's Cabinet |
|  | The Dean's Council |
|  | Physical Environment Committee (Chair) |
|  | Facilities Design Committee (Chair) |
|  | Open House Committee |
|  | Auction |
|  | Collegium Society (Co-Chair) |
|  | Campus Design Solutions (Director) |
|  | Dean's Council, Aging and the Community |
|  | Dean's Council, Partnership in Education |
| 2004 – 05 | Community Design Solutions (Director) |
|  | Masterplanning Task Force (Chair) |
|  | Academic Dean's Council |
|  | Dean's Council, Aging and the Community |
|  | Dean's Council, Partnership in Education |
|  | Facilities Design Committee |
|  | Open House Committee |
| 2005 – 06 | The Academic Dean's Council |

29

|  | Dean's Council, Aging and the Community |
|---|---|
| | Dean's Council, Partnership in Education |
| | Community Design Solutions (Director) |
| | Masterplanning Task Force (Chair) |
| 2006 – 07 | Academic Dean's Council |
| | The Academic Dean's Council |
| | Dean's Council, Aging and the Community |
| | Dean's Council, Partnership in Education |
| | Community Design Solutions (Director) |
| | Search and Screen Committee, CEAS Dean |
| 2007 – 08 | Academic Dean's Council |
| | Chair, Search and Screen Committee, Vice Chancellor for Development |
| | Chair, Coordinating Committee, Masterplanning |
| | Academic Staff Pay Committee |
| 2008 – 09 | Academic Dean's Council |
| | Chair, Coordinating Committee, Masterplanning |
| | Academic Staff Pay Committee |
| | Business Engagement Task Force |
| 2009-10 | Academic Dean's Council |
| | Chair, Coordinating Committee, Masterplanning |
| | Business Engagement Task Force |
| | Academic Staff Pay Committee |
| | Daycare Planning Committee |
| | Task Force on Internationalization: Implementation Work Group |
| 2010 - 11 | Academic Dean's Council |
| | Internationalization Implementation Committee |
| | Columbia Hospital/Northeast Quadrant Committee |
| | Strategic Research Planning (Centers of Excellence) |
| 2011 - 12 | Academic Dean's Council |
| | Budget Model Working Group |
| | New Deans' Workshop |
| 2012 - 13 | Academic Dean's Council |
| | Budget Model Working Group |
| | Continuing Education Working Group |
| 2013 – 14 | Academic Dean's Council |
| | Academic Leadership Council |
| | Budget Model Working Group |
| | Search and Screen Committee, Graduate School Dean |
| | Search and Screen Committee, Vice Chancellor for Administrative Affairs |
| | Academic Planning and Curriculum Committee |
| | Physical Aspects Strategic Planning |
| | Enrollment Task Force |

5.3     Involvement in Student Activities

Publication of numerous articles in student publications, 1971-present (not listed in 3.1).

Writer/Producer of annual revue, Departments of Architecture and Town Planning, 1975-1978.

Editor or originator of various student/college magazines, including A.D. Events, Kansas Architect, K.A. Annual and Archimage.

Organizer of annual Graphics Day, Careers Day and Alumni Open House (UWM) and participant at several Friday Afternoon Live lecture presentations.

Faculty Advisor, Student Chapter/American Institute of Architects, UWM.

Faculty Advisor, Third Coast Design Cooperative, UWM.

Presentation at National American Institute of Architects Student Conference, Chicago, 1989.

Panelist, AIAS Grassroots Conference, Washington, December 1995.

Speaker, AIAS Forum, February 2006.

Speaker, AIAS Forum, January 2008.

Speaker, AIAS Quad Conference, Spring Green, 2010.

Keynote Speaker, AIAS, Spring 2012.

Keynote Speaker, AIAS Quad Conference, 2013.


5.4     Membership in Professional Organizations

Registered Architect, Architect's Registration Board of the United Kingdom.

Associate of the Royal Institute of British Architects.

Fellow of the Royal Society of Arts.

Associate of the Chartered Institute of Arbitrators (1976 – 2002).

Member of the Commercial Panel of Arbitrators, American Arbitration Association (1981 - 2014

Member of the Mediation Panel, American Arbitration Association (1981 – 2014).

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 54 of 117   Document 59-8

International Associate Member, American Institute of Architects.

Associate Member, Wisconsin American Planning Association.

Member, Wisconsin Humanities Association.

5.5    Special Assignments for Professional Organizations

5.5.1    Assignments for Professional Organizations

State and Local

1    Committee member involved in organization of the Wisconsin Society of Architects Convention, 1982, 1987 and 1989.

2    Member of the Editorial Board, Wisconsin Architect, the magazine of the Wisconsin Society of Architects.

3    Moderator, Debate between Zaha Hadid and James Wines, Wisconsin Society of Architects Convention, May 1989.

4    Appointed to Board of Directors, Wisconsin Architects Foundation, 1989.

5    Coordinator, Legal Aspects of Architecture Panel, WSA Convention, May 1990.

6    Moderator, Art/Architecture Collaboration Conference, Marquette University/ University of Wisconsin-Milwaukee, January 1991.

7    Member, WAPA Continuing Education Task Force.

8    Member, Board of Directors, Wisconsin Architectural Archives.

9    Presenter, AIA-Wisconsin Annual Convention, May 1996.

10    Presenter, AIA-Wisconsin Fall Workshop, October 1996.

11    Presenter, Construction Specification Institute dinner, October 1997.

12    Member, AIA-Wisconsin Continuing Education Task Force.

13    Presenter, Future Milwaukee 1999.

14    Presenter, Historical Society of Wisconsin 2001.

15    Presenter, AIA-Wisconsin Southeast Chapter Legal Workshop 2001.

16    Presenter, AIA-Wisconsin Southwest Chapter 2002.

17    Presenter, AIA Wisconsin Northeast Chapter 2002.

18    Panelist, Civil Trial Council of Wisconsin Annual Conference, May 2005.

19    Moderator and Presenter, AIA-Wisconsin Fall Workshop, Kohler, 2004.

20    Presenter, AIA-Wisconsin Southeast Chapter, March 2005.

21    Presenter AIA-Wisconsin Northeast Chapter, May 2005.

22    Speaker, Green Building Workshop, 2005.

23    Speaker, Green Conference, Milwaukee, 2007.

24    Speaker, AIA-Wisconsin Southwest Chapter, 2008.

25    Keynote Speaker, OSHER Annual Meeting, Milwaukee, 2010.

26    Speaker, Golda Meir Library Annual Lecture, 2011.

27    Speaker, Parks People, Milwaukee 2011.

28    Keynote Speaker, WCREW Annual Awards, 2011.

29    Keynote Speaker, Milwaukee Art Museum Annual Friends Meeting, 2011.

30    Panelist, Historic Milwaukee Annual Meeting, 2012.

31    Master of Ceremonies, WCREW Annual Awards, 2013.

32    Panelist, Wisconsin State Bar Convention, 2014.

33    Speaker, Wauwatosa Rotary, 2013.

34    Opening Speaker, Wisconsin Green Builders Association, 2013.

Regional

1    Regular presentations at regional meetings for state organizations (see 3.6).

2    Chair, ACSA West Central Business Meetings, October 1991.

3    Organizer of the Regional ACSA Conference, October 1984. This involved setting
     the theme of the conference, coordinating the various workshops, organizing the

accommodations, banquet and keynote speakers and editing the published proceedings.

4    Co-speaker (with G. Snyder) Graham Foundation, March 1996, introducing 10-year retrospective of award-winning student work entitled "Materiality and Realism."

5    Presenter (with G. Snyder) to Friends of Unity Church, Madison, 1995.

6    Moderator, Wisconsin American Planning Association, Milwaukee, 1995.

7    Speaker, Milwaukee Journal/Sentinel Forum on Progress, Waukesha, September 1997.

8    Panel Presenter, Wisconsin State Bar, Madison, 2000.

9    Panelist, AIA-Minnesota Annual Meeting, 2001.

10   Moderator, Milwaukee Art Museum debate, 2002.

11   Keynote Address, 1000 Friends of Wisconsin Annual Meeting, September 2004.

12   Keynote Address, Keep Milwaukee Beautiful Annual Meeting, October 2004.

13   Speaker, Environmental Protection Agency, Chicago, January 2005.

14   Speaker, Conservation Coalition, May 2005.

15   Speaker, Department of Natural Resources, Wisconsin, 2005.

16   Keynote Speaker, Small Cities Symposium, Wisconsin, 2004.

17   Commencement Speaker, University of Wisconsin-Waukesha, 2004.

18   Speaker, Governor's Conference on Downtown Development 2004.

19   Panelist, Governor's Economic Summit 2003.

20   Keynote Speaker, Wealth of Cities Forum, Beloit, 2005.

21   Speaker, Mayor's Club 2005.

22   Opening Speaker, Commercial Association of Realtors, Wisconsin, 2005.

23   Speaker, Wisconsin Women's Transportation Seminar, Milwaukee, 2005.

24   Speaker, Milwaukee Art Museum, 2007.

25   Speaker, Milwaukee Public Museum, 2007.

26 Speaker, City of Madison Administration, 2010.

27 Keynote Speaker, Wisconsin Association of Academic Librarians, 2010.

28 Speaker, American Institute of Architects, Chicago, 2010.

29 Speaker, Women in Construction Conference, Milwaukee, 2011.

30 Speaker, 2012 Design Awards, AIA Northern Illinois, 2013.


## National

1 Organization of Exhibition in the American Institute of Architects Headquarters, Kansas City, on behalf of the Kansas City Arts Coalition, 1980.

2 Faculty Councilor, Association of Collegiate Schools of Architecture, 1985-90.

3 Secretary and member of the Executive Committee of the National Board of Directors, Association of Collegiate Schools of Architecture, 1988-90.

4 Member of the Editorial Board for the Instructor's Handbook to the Architect's Handbook of Professional Practice, published by the American Institute of Architects, 1988.

5 Coordinator, ACSA Special Focus Group, Law and Practice in Architecture. Group involves newsletter, annual paper session and publication of proceedings, 1985-95.

6 Member of ACSA International Relations Committee, 1990.

7 Member of ACSA Resource Planning Task Force, 1991.

8 Treasurer and member of the Executive Committee of the Association of Collegiate Schools of Architecture, 1990-91.

9 Panel member, Women's Issues Seminar, ACSA National Meeting, Washington, 1991.

10 Presentation at ACSA Administrators Conference, Co-Chair of New Administrators' Workshop, Puerto Rico, 1991.

11 Presenter, Junior Faculty Workshop. ACSA Annual Meeting Orlando, 1991.

12 Member ACSA Continuing Education Task Force, 1995.

13 Moderator, Junior Faculty Workshop. Association of Collegiate Schools of Planning, Columbus, Ohio, 1992.

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 58 of 117   Document 59-8

14  Session moderator and presenter, ACSA Administrators' Conference, Santa Fe, 1992.

15  Invited Juror, Association of Collegiate Schools of Planning, Philadelphia, 1993.

16  Organizer and presenter, New Administrators' Workshop, ACSA Administrators' Conference, San Antonio, 1993.

17  Member, Continuing Education Task Force (ACSA, AIA, NCARB, NAAB and AIAS), 1994-96.

18  Practice Chair, ACSA Annual Meeting, Montreal, 1994.

19  Coordinator, Junior Faculty Workshop ACSA Annual Meeting, Seattle, 1995.

20  Opening Remarks, ACSA Teacher's Seminar, Cranbrook, 1995.

21  Presenter, ACSA Administrators' Conference, Milwaukee, 1995.

22  Presenter, "Frank Lloyd Wright" Conservancy Conference, 1995.

23  Paper Reviewer, ACSA Annual meeting, Dallas, March 1997.

24  Presenter, Junior Faculty Workshop. Association of Collegiate Schools of Planning, Fort Lauderdale, November 1997.

25  Opening Speaker, ACSA Administrators' Conference, Jackson, MS, November 1997.

26  Panel Organizer and Speaker, American Institute of Architects Annual Convention, San Francisco, 1998.

27  Keynote Address, Center for Instructional and Professional Development Annual Conference, UWM, 1998.

28  Planning Committee member, Congress of New Urbanism, Milwaukee, 1999.

29  Workshop presenter, Association of Collegiate Schools of Architecture Administrators' Conference, Washington, DC, 1998.

30  Organizer, Plenary Session, Association of Collegiate Schools of Architecture Annual Meeting, Minneapolis, 1999.

31  Workshop presenter, Association of Collegiate Schools of Planning, Chicago, 1999.

32  Workshop presenter, Association of Collegiate Schools of Architecture, Los Angeles, 2000.

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 59 of 117   Document 59-8

33  Workshop presenter, Association of Collegiate Schools of Architecture Administrators' Conference, San Francisco, 2000.

34  Workshop presenter, Association of Collegiate School of Architecture Annual Meeting, Baltimore, 2001.

35  Keynote lecturer, USDA Forestry Service, 2001.

36  Workshop presenter, ACSA Administrators' Conference, New York, 2001.

37  Workshop presenter, ACSA Administrators' Conference, Louisville, Kentucky, 2002.

38  Program Chair, American Institute of Architects National Convention, 2003.

39  Workshop Presenter and Panelist, ACSA Administrators' Conference, Houston, 2004.

40  Presenter, Engaged Learning Conference, Wingspread, WI, 2004.

41  Workshop Presenter, ACSA Annual Meeting, Chicago, 2005.

42  Workshop Presenter, ACSA Administrators' Conference, Baltimore, 2005.

43  Keynote Speaker, Urban Development Conference, Cincinnati, 2006.

44  Workshop Presenter, ACSA Administrators' Conference, Scottsdale, Arizona, 2006.

45  Keynote Speaker, Wisconsin American Planning Association, Fall, 2007.

46  Keynote Speaker, Construction Specification Institute, Spring, 2007.

47  Speaker, ACSA Administrators' Conference, Fall, 2007.

48  Speaker, ACSA Administrators' Conference, Minneapolis, 2007.

49  Presenter, American Institute of Architects Knowledge Leadership Conference, Milwaukee, 2008.

50  Speaker, ACSP Conference, Milwaukee, 2007.

51  Member, AIA Governance Task Force, 2008.

52  Workshop Presenter, ACSA Administrators' Conference, Savannah, 2008.

53  Keynote Speaker, American Institute of Architects Annual Convention (Public Architects), San Francisco, 2009.

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 60 of 117   Document 59-8

54    Workshop Presenter, ACSA Administrators' Conference, Washington, 2010.

55    Workshop Presenter, ACSA New Administrators' Conference, Los Angeles, CA, 2011.

56    Workshop Presenter, ACSA New Administrators' Conference, Austin, TX, 2012.

57    Keynote Speaker, Arc-US Architect's Forum, San Diego, CA, 2012.

58    Keynote Speaker, Bond Interiors, Boca Raton, 2013.

59    Panelist, Topaz Symposium AIA Convention, Denver, 2013.

60    AIA Large Firm Roundtable, 2013.

61    Keynote Speaker, Bond Latin America, Cancun, Mexico, 2014.

62    Keynote Speaker, Bond Multi, San Diego, 2014.

63    Presentation, Architecture League, New York, 2014.

International

1    Organization of exhibition entitled "Something the Matter with Glasgow?," Oxford, 1977.

2    Chair, Association of Collegiate Schools of Architecture International Conference, Copenhagen, 1996.

3    Presenter to Prague government officials, American Embassy, Czech Republic, 2008.

4    Speaker, International Downtown Association, 2010.

5    Tour Leader, National Preservation Association, 2010.

5.5.2    Papers and Other Presentations/Juries at Academic and Professional Meetings

5.5.2.1    Academic Institutions

| Kansas State University | April 1979 |
| University of Kansas | January 1980 |
| Central Polytechnic, London | May 1980 |
| Plymouth Polytechnic | October 1980 |

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 61 of 117   Document 59-8

| | |
|---|---|
| Arizona State University | April 1984 |
| Ball State University | September 1984 |
| Massachusetts Institute of Technology | October 1984 |
| Oxford Polytechnic | January 1985 |
| Central Polytechnic, London | January 1985 |
| Washington University, St. Louis | March 1985 |
| University of Washington, Spokane | October 1985 |
| Washington University, St. Louis | October 1985 |
| Nottingham University, England | March 1986 |
| Miami University, Ohio | September 1986 |
| Andrews University, Michigan | March 1987 |
| University of Illinois at Chicago | May 1987 |
| Imperial College, London | September 1987 |
| Iowa State University | October 1987 |
| University of Illinois at Chicago | November 1987 |
| University of Minnesota | March 1988 |
| University of Hong Kong | May 1988 |
| Oxford Polytechnic | July 1988 |
| University of Illinois at Chicago | May 1989 |
| School of Architecture, Kent Institute of Art and Design | March 1993 |
| Oxford Brookes University | June 1993 |
| Architectural Association, England | June 1994 |
| Manchester University, England | July 1994 |
| Universidade Lusiada, Lisbon, Portugal | May 1995 |
| Ball State University | November 1995 |
| Drury College | January 1996 |
| Royal Danish Academy of Fine Arts | May 1996 |
| Oxford Brookes University, England | June 1996 |
| University of Minnesota | May 2001 |
| University of Wisconsin-Stevens Point | 2004 |
| Marquette University | 2005 |
| Beloit College | 2005 |
| University of Cincinnati | 2006 |
| Czech Technical University, Czech Republic | 2008 |
| Czech Institute, North Carolina State University, Czech Republic | 2008 |
| Taliesin, Wisconsin | 2010 |
| Universidad del Pais Vasco, Bilbao | 2011 |
| Monash University, Prato, Italy | 2012 |
| Charles University, Prague, Czech Republic | 2013 |
| University of Amsterdam, Netherlands | 2013 |
| University of Wisconsin-Parkside, Wisconsin | 2013 |

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 62 of 117   Document 59-8

5.5.2.2    Professional Organizations

Invited to present papers to the following organizations:

| | |
|---|---|
| Wisconsin Society of Architects Annual Convention | May 1983 |
| Wisconsin Society of Architects Annual Convention | May 1984 |
| Wisconsin Society of Architects Annual Convention | September 1984 |
| Wisconsin Society of Architects Research Workshop | September 1984 |
| Institute of Business Designers | November 1984 |
| Wisconsin Society of Architects (Southeast Chapter) | November 1984 |
| Minnesota Society of Architects Annual Convention | November 1985 |
| Wisconsin Society of Architects (Northeast Chapter) | November 1985 |
| American Institute of Architects Washington, D.C. | December 1985 |
| Wisconsin Society of Architects (Northeast Chapter) | April 1986 |
| Wisconsin Society of Architects Annual Convention | May 1987 |
| Department of Public Instruction, Wisconsin | November 1988 |
| Wisconsin Landscape Architects Association | February 1989 |
| American Institute of Architects Students' Annual Meeting | April 1989 |
| ACSA West Central Chapter | October 1990 |
| WAPA Midwest Regional Meeting | October 1990 |
| Project Management Institute | January 1991 |
| American Institute of Architects Board of Directors | 1995 |
| American Institute of Architects—Wisconsin Annual Convention | 1996 |
| American Institute of Architects—Wisconsin Fall Workshop | 1996 |
| Construction Specification Institute | 1997 |
| American Institute of Architects Annual Meeting | 1998 |
| Wisconsin State Bar | 2000 |
| Numerous other presentations to civic groups: | 1991- |

Greater Milwaukee Committee, Rotary, Kiwanis, Certoma,
Board of Regents, Retired Faculty, Gyros, Collegium Society,
Board of Visitors, Historic Guild, Holmes Group,
Retired Men's Club, Tempo, Assisted Living Center,
Whitefish Bay Women's Club, 1000 Friends of Wisconsin,
Shorewood Men's Club, Park People, Future Milwaukee,
Greater Milwaukee Committee, Mayor's Club,
Wisconsin Presidents' Organization, Historic Milwaukee,
Women's Court and Civil Conference,
Public Policy Forum, Milwaukee Club, UWM School of Continuing Education,
Shorewood Historical Society, Women's Club of Milwaukee, Boy Scouts,
Retired Faculty Association, ABCD, Milwaukee Jewish Museum,
Wisconsin Energy, Wisconsin Sign Association,
and various church groups and clubs.

5.5.3    Editorial Boards and Review Activities

1982 - present        Member of the Editorial Board, Wisconsin Architect

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 63 of 117   Document 59-8

| 1982 | Member of the Editorial Board, Central Magazine |
| 1984 - 90 | Book proposal reviewer for Van Nostrand Reinhold, New York |
| 1987 | Book proposal reviewer for the American Institute of Architects Press |
| 1985 - 87 | Member of Editorial Board, Representation |
| 1986 | Encyclopedia reviewer for John Wiley and Sons, New York |
| 1987 - 95 | Proposal reviewer for the National Endowment of the Arts |
| 1987 - 88 | Member of the Editorial Board of the Instructor's Manual to The Architect's Handbook of Professional Practice (American Institute of Architects) |
| 1989 - 94 | Book and paper reviewer, Journal of Architectural Education |
| 1991 - | Editorial Board and reviewer, Journal of Architecture and Urban Planning Research |
| 1991 - 95 | Book reviewer, Butterworths Publishers |
| 1999 - 2002 | Editorial Board member, Architectural Research Quarterly |

5.6    Awards and Honors

Elected Fellow of the Royal Society of Arts, United Kingdom, 1984.

Listed in:   Who's Who in the Midwest, 21st Edition, 22nd Edition and 24th Edition

Who's Who of Emerging Leaders in America, 2nd Edition

The International Directory of Distinguished Leadership, 2nd Edition

Men of Achievement, 13th and 14th Editions

Personalities of the Americas

International Leaders in Achievement, 2nd Edition

5,000 Personalities of the World, 2nd Edition

Who's Who in Commercial and Residential Real Estate

41

Community Leaders of America, 14th Edition

Who's Who in America, 23rd, 24th, 51st, 60th and 62nd Edition

Who's Who in Finance and Business, 35th Edition

Who's Who in American Education, 3rd and 4th Edition

Who's Who in Science and Engineering

International Who's Who of Professionals

Who's Who Among America's Teachers, 7th Edition

Cambridge Who's Who, 2009

Urban House Rehabilitation Service Award, Milwaukee Public Schools, 1989

Progressive Architecture Citation, 1989    (Awarded to Preiser W., Rabinowitz H.,
White E., for "Occupancy Evaluation
Guidelines," Contributed legal chapter)

ACSA Citation for Service, 1990

ACSA Citation for Service, 1991

Certificate of Appreciation AIA-Wisconsin, 1994

ACSA Citation for Service, 1994

UWM Community Partnership Award, 1994: Inner City Studio (various faculty and
students)

UWM Community Partnership Award, 1995: Young Architects Club (various faculty
and students)

Citation for Distinguished Service, presented by AIA-Wisconsin, October 1997

Distinguished Professor, Association of Collegiate Schools of Architecture, 1999

UWM Employee Development Excellence Award, 2003

Elected to Phi Kappa Phi, 2004

Appointed UWS Wisconsin Idea Fellow, 2004

Citation for Service From:

| | |
|---|---|
| UWM Alumni Association | 2004 |
| UWM Faculty Senate | 2004 |
| UWM Student Association | 2004 |
| UWS Board of Regents | 2004 |

ACSA Service Award, 2005

Certificate of Appreciation, UWM Mentoring Program, 2005

Leading Future Leaders Award, UWM, 2005

Architect Educator of the year (1 of 7), Design Intelligence, 2006

Most Respected and Admired Educators, Design Intelligence, 2008

Nominated for Topaz Award, American Institute of Architects and Association of Collegiate School of Architecture, 2008.

Citation for Service, American Institute of Architects Wisconsin, 2009

Appointed Senior Fellow, Design Intelligence, 2009

Most Respected and Admired Educators, Design Intelligence, 2009

Certificate of Appreciation, Association of Licensed Architects, 2010

Recognized as 'Citizen Architect' by American Institute of Architects, 2010

Awarded Topaz Medallion, Association of Collegiate Schools of Architecture and American Institute of Architecture, 2013

Granted Freedom of the City of London, 2012

Messenger Award for Excellence in Journalism, 2013

## 5.7 Community, Regional and State Activities

### 5.7.1 Community and State Activities

1 Preparation of "The Oread Neighborhood Association Design Guide," 1980.

2 Preparation of "Designs for Saukville, (Co-Author K. Keegan) 1984.

3 Preparation of "Visions of the Future" for the city of Port Washington, Wisconsin,

43

1985, exhibition and booklet.

4   Minority Recruitment presentations, University of Wisconsin, 1983-present.

5   Presentation of seminar on "Ethics and the Professions," Urban Design Symposium, School of Architecture and Urban Planning, University of Wisconsin-Milwaukee, 1986.

6   Organization of a debate on the problems of modern architecture, British Broadcasting Corporation (BBC) Radio Two, 1976.

7   Presentation at Careers Day, Oneida Reservation, April 1983.

8   Team member, Art Cart Caper, 1987, 1988.

9   Coordinator, UWM Float entry, City of Festivals Parade, Milwaukee (1st place winner).

10  Member, Urban Household Rehabilitation Advisory Board, City of Milwaukee.

11  Designer, playground layout and facilities, Philips Daycare Center, YWCA of Greater Milwaukee.

12  Presenter, The University of Continuing Education Association Annual Conference, Milwaukee, June 1996.

13  Presenter, Historic Guild of Milwaukee, 1999.

14  Speaker, Frank Lloyd Wright Lecture Series, Madison, 2008.

15  Keynote Speaker, In Business Awards Program, Madison, 2008, 2010.

16  Speaker, Sustaining Cities Conference, Milwaukee, 2008.

17  Keynote Speaker, Milwaukee Art Museum Members Annual Meeting, 2011.

5.7.2   Service on Advisory Boards 1990 - 2006

    1  Member of Advisory Board Enterprise South.

    2  Riverside High School Advisory Board (Professional Program).

    3  Milwaukee Area Technical College Advisory Committee.

    4  Member, Education Council, Associated General Contractors.

    5  Elected Chair, 1998, Milwaukee City Plan Commission.

44

6    Milwaukee Ballet Building Committee, 2004 - present.

7    Eisner Museum Advisory Board.

8    Board of Directors, Wisconsin Architectural Archive.

9    Wisconsin Architect Advisory Board.

10   Milwaukee Public Market Steering Group.

11   Urban Land Institute Program Committee.

12   Mayoral appointments to Task Forces on:
     - Light Rail
     - I-794 Freeway Redesign
     - Market Rate Housing
     - Zoning Code Review Task Force
     - Downtown Plan Committee
     - Congress of New Urbanism Planning Committee.

13   "Ten Chimneys" Restoration Project: Preservation Advisor.

14   Facilities Design Committee, University School of Milwaukee.

15   House Wisconsin Advisory Committee.

16   Bradley Technical School. Advisory Board, 2003 - 2004.

17   Milwaukee Partnership Academy, 2003 - 2004.

18   Board of Directors, Bell Real Estate Institute, 2004 -

19   Corporate Member, Board of Directors, Milwaukee Protestant Home, 2006 -

20   Wisconsin Trustee, Taliesin Preservation Incorporated, 2008 –
                      Elected to Executive Committee, 2011.

21   Executive Council, Cultural Alliance of Greater Milwaukee, 2010 – 2011.

22   Lakefront Improvement Advisory Committee, 2011 -

23   West Wisconsin Avenue Revitalization Committee, 2011.

24   Design Review Team, Department of City Development, 2004 -- present.

25   Harmony Initiative (UWM, Milwaukee Ballet, Medical College of Wisconsin) 2011-

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 68 of 117   Document 59-8

26   Northwest Mutual Building Advisory Committee, 2013.

5.7.3     Other Service:  Consultations, Arbitrations and Adjudications

1   Consultation with the Department of Public Works, Western Samoa, concerning development of a new building control system. (Feasibility report prepared), 1978.

2   Consultation with Department of the Environment, United Kingdom, concerning proposed changes in the current building control system, 1979.

3   Private consultation with architects, contractors, lawyers and professional groups in Wisconsin, 1981-present.

4   Appointed to the Construction Panel of the American Arbitration Association, 1985-present.

5   Judge, Inland Steel "Building of the Year" Awards Program, 1986.

6   Technical Judge, AFRC Hotel Competition in Garmisch-Partenkirchen, Germany (value $100,000,000), 1986-87.

7   Judge, Belle Awards Program, Racine Urban Aesthetics, 1998-1992.

8   Juror, Newhouse Competition, Chicago, 1991-1993.

9   Juror, Wisconsin American Planning Association Annual Awards.

10   Juror, Blue Heron Girl Scouts building program.

11   Feasibility study for a new architectural program, Florida Atlantic University, 1995.

12   Technical member, Architects' Selection Committee, Milwaukee Art Museum.

13   Jury member, American Institute of Architects, Chicago Chapter, Young Architects Competition, 1996.

14   Program Appraiser, Bachelor of Science Degree, New Jersey Institute of Technology, November 1996.

15   Jury member, Topaz Award, ACSA/AIA, Washington, 1996.

16   Appointed to the Panel of Mediators, American Arbitration Association, 1997.

17   Juror, MSI Annual Design Awards, 2001.

18    Member, Architects and Construction Manager's Selection Committee, Milwaukee Area Technical School, 2000.

19    Technical member, Architect's Selection Committee, Milwaukee Theater, 2001.

20    Member, Architect's Selection Committee, Third Ward Market, 2001.

21    Juror, American Institute of Architects Wisconsin Firm Award, 2001.

22    Technical Advisor, Indian Community School, 2003.

23    Juror, Pier Wisconsin Competition, 2003.

24    Juror, MIAD Open Space Sculpture Competition, 2004.

25    Juror, Erie Street Plaza Competition, 2005.

26    Juror, Business Journal Awards, 2006 - 2014.

27    Artist Selection Committee, Wisconsin Avenue Street Art Program, 2006.

28    In Business Awards Program, 2008, 2009, 2010, 2011, 2012, 2013.

29    Mayor's Urban Design Awards, 1998 – 2013.

30    Public Art Selection Committee, Milwaukee, 2007 –

31    Technical Advisor, Kohler Art Museum

32    Juror, Marcus Prize, 2005 – 2014.

33    Juror, Urban Edge Award, 2006 – 2010.

34    Juror, Association of Licensed Architects Annual Awards, 2009.

35    Juror, American Society of Architectural Illustrators, 2010.

36    Architect Selection Committee, Kohler Art Preserve, 2010.

37    Juror, Developer Selection Committee, Italian Conference Center, 2011.

38    Juror, WCREW Real Estate Awards, 2011, 2012.

39    Juror, American Institute of Architects (Missouri) Design Awards, 2012.

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 70 of 117   Document 59-8

40  Architects Selection Committee, Forest Exploration Center, Wisconsin, 2012.

41  Contractor Selection Committee, Forest Exploration Center, Wisconsin, 2012.

# APPENDIX B

## Comparison of Design Basics and Lexington models regarding "substantial similarity"

# EXAMPLE 1

**Design Basics MODEL: 3102**

**Name:**      Aspen

**Style:**      Traditional

**Description:**

      Number of floor levels: 1

      Number of bedrooms: 3

      Number of bathrooms: 2

      Number of garage stalls: 3

**Square footage:** 1,339

---

**LEXINGTON MODEL**

**Name:**      Carlisle

**Style:**      Ranch

**Description:**

      Number of floor levels: 1

      Number of bedrooms: 3

      Number of bathrooms: 2

      Number of garage stalls: 2

**Square footage:** 1,663

---

## PRIMARY DIFFERENCES ON ELEVATION

**Roof:**

- Lexington's Carlisle roof is configured differently from Design Basic's Aspen

2

- Lexington's Carlisle's right gable sits close to the middle of the front elevation while Design Basics' Aspen right gable extends to the far right of the building
- Carlisle's eaves are of a different design than Aspen's

**Walls**
- Carlisle's exterior walls are differently configured than Aspen's.
- Lexington's Carlisle has two front walls to the right of its entrance, one extending forward of the other. Aspen has a single wall to the front of its entrance.

**Windows**
- Carlisle's windows differ in design and dimension from Aspen's
- Carlisle's two front windows are set in different walls; one window in the front eave and another front window set back and flush to its exterior front elevation. Design Basics' Aspen right gable incorporates two identical windows in its front eave with sided pitch features over each window frame

**Doors**
- Carlisle's front door differs in design detailing vertical glass panes while Aspen's front door's only glass feature is in the upper arch of the door
- Carlisle's garage door is of a different design than Aspen's which has a decorative three-paneled feature

**Decorative features**
- Carlisle has coach lamps flanking its garage door while Aspen has none
- Carlisle has no decorative features above its windows while Aspen has decorative sided triangular features above its front window panes

3

**Materials**

- Lexington's Carlisle right gable is faced with shingle while Design Basic's Aspen's roofing material extends half way down its right gable
- Lexington's Carlisle makes more extensive use of siding than Design Basics' Aspen
- Carlisle's garage gable is sided while Aspen's has a smaller siding feature within the eave that is largely covered in roofing.

---

### PRIMARY DIFFERENCES ON PLAN

Carlisle's living, sleeping and utility space is differently configured than Aspen.

**Garage/Parking**

- Carlisle's garage has a square footage of 569 while Aspen's is 496
- Carlisle's garage differs in shape from Aspen's
- Carlisle's has no designated garage storage space while Aspen specifies a storage area

**Living spaces**

**Great room**

- Carlisle's Great Room is 17'10" x 18' while Aspen's is 14' x 17'4"
- Carlisle's Great Room is L-shaped while Aspen's is oblong
- Carlisle has an optional fireplace located in the back left corner of the Great Room while Aspen's fireplace is located centrally on the back wall
- Carlisle has a single large window on its back great Room wall while Aspen has a small window each side of its centrally located fireplace
- Carlisle does not specify a 10-foot ceiling while Aspen does

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 75 of 117   Document 59-8

**Kitchen**

- Carlisle differs from Aspen in kitchen location, shape, and dimension
- Carlisle's kitchen is much larger (13'6" x 13') than Aspen's (10 x 10'4")
- Pantries are differently located: Carlisle's is located in the front right corner of the room adjacent to the exterior wall while Aspen's is in the back left corner adjacent to the internal stairwell

**Breakfast/Dining**

- Carlisle specifies a dining area while Aspen specifies a breakfast area
- Carlisle's dining area at 13'6" x 10' is much larger and differs in shape from Aspen's breakfast area which is 10' x 9'
- Carlisle has no doorway at the back of its dining area while Aspen has a doorway at the back between the breakfast room and the Great Room

**Sleeping spaces**

**Bedroom 1**

- Master bedrooms differ in dimension with Carlisle at 12''6" x 14' and Aspen at 12' x 14'
- Carlisle specifies a tray ceiling; Aspen specifies a 9' ceiling
- Doors are differently located
- Carlisle's window is narrower than Aspen's

**Bedroom 2**

- Second bedrooms differ in dimension with Carlisle's at 12'8" x 12' being significantly larger than Aspen's at 10' x 10'
- Carlisle's bedroom sits forward of the front exterior wall of the third bedroom while Aspen's bedrooms 2 and 3 are aligned and sit flush to its front exterior wall
- Closets are differently located

5

### Bedroom 3

- Third bedrooms differ in size with Carlisle's at 11' x 11' and Aspen's at 10' x 10'
- Carlisle's second and third bedrooms differ from each other in size and shape while Aspen's are identical to each other in size and shape
- Third bedrooms differ in location to the exterior front wall

## Bathrooms

### Bathroom 1

- Carlisle's master bathroom has a single washbasin while Aspen's has two washbasins
- Carlisle does not specify a whirlpool while Aspen does

### Bathroom 2

- Linen closets are differently configured
- Doors are differently configured

## Other spaces

- Stairwells to the basement are differently located with Carlisle's moving down from the front to the back of the building and Aspen's from back to front
- Carlisle's has no external covered area adjoining its kitchen and dining area while Aspen specifies a covered area alongside its kitchen and breakfast area
- Covered entry on Carlisle differs in shape and design from Aspen's covered stoop
- Carlisle has two plant shelves while Aspen does not

## EXAMPLE 2

**Design Basics MODEL: 8532**

**Name:** Kendrick

**Style:** Cottage

**Description:**

    Number of floor levels: 1

    Number of bedrooms: 3

    Number of bathrooms: 2

    Number of garage stalls: 2

**Square footage:** 1,195

---

**LEXINGTON MODEL**

**Name:** Oakridge

**Style:** Ranch

**Description:**

    Number of floor levels: 1

    Number of bedrooms: 3

    Number of bathrooms: 2

    Number of garage stalls: 2

**Square footage:** 1,735

Case 1:14-cv-01102-WCG   Filed 03/07/16   Page 78 of 117   Document 59-8

## PRIMARY DIFFERENCES ON ELEVATION

### Roof

- Oakridge elevation displays a secondary, single story roof covering the extended dining area below while Kendrick does not

### Walls

- Oakridge's garage gable is differently designed and constructed than Kendrick
- Oakridge has no chimney visible along its left exterior wall while Kendrick has a chimney extending the full height and above its left exterior wall
- Oakridge has a low wall extending in front of a covered area in the right front of the building. Kendrick has no wall marking off a front-facing covered area

### Windows

- Oakridge has a small window visible below the single story roof on its right front while Kendrick has no small window
- Kendrick has a shuttered window feature in its garage gable while Oakridge does not
- Oakridge's three front lower windows are 12-paned while Kendrick's are 7-paned
- Oakridge's three upper level windows are separated by wider frames than Kendrick's

### Doors

- Oakridge's garage door is differently framed from Kendrick's and has different decorative details above the door    Oakridge's garage door is differently designed.    Oakridge's garage door has 32 small identical

panels while Kendrick has four large panels topped by three small panels over each large one

**Decorative features**

- Oakridge's garage door is flanked by coach lamps while Kendrick's is not
- Oakridge's front columns are longer and cleaner in design than Kendrick's
- Oakridge has no decorative front railing while Kendrick does
- Oakridge has no decoration on the pitched eave of its garage while Kendrick appears to have a decorative beam under the pitch of its garage
- Oakridge has a feature of vertical boards on its roof gable and no louver, while Kendrick has a horizontal shingle with a louver

**Materials**

- Oakridge makes extensive use of stone, including a stone wall extending across the front of the building.  Kendrick uses stone only as an accent material, showing a wood railing rather than a wall along its front ground level
- Oakridge uses less siding than Kendrick and Oakridge's shingles are smaller than Kendrick's and differently located

**PRIMARY DIFFERENCES ON PLAN**

**Garage/Parking**

- Garages differ in dimension and shape.  Oakridge is 583 square feet and almost square while Kendrick is 430 square feet and oblong
- Oakridge has one internal door from the garage to the house while Kendrick has both an internal and an external door on the right exterior wall

9

### Living spaces

#### Great Room/Family Room

- Oakridge specifies a Great Room while Kendrick specifies a family room. The rooms differ in location, dimension and shape
- Oakridge's Great Room is 16' x 17'6" and separate from its 14' x 10' dining room. Kendrick's family room is dual purpose and includes a dining space for a total area of 13'8" x 20'
- Oakridge's optional fireplace is located internally while Kendrick's standard fireplace is located against the right exterior wall with a chimney against that wall
- Oakridge Great Room has no doors while Kendrick's family room has a door opening from its covered porch and closet doors
- Windows are differently located

#### Kitchen

- Oakridge's kitchen differs in location, dimension, and shape from Kendrick's
- Oakridge dimensions are 13' x 13'6" while Kendrick is smaller at 11' x 9'3"
- Oakridge has a central island while Kendrick has none
- Windows are differently located with Oakridge's kitchen windows facing the rear and right sides of the building and Kendrick's single window facing the left side
- Oakridge's cabinet doors extend into the kitchen at a right angle while Kendrick's do not
- Oakridge's kitchen lies fully adjacent to the master bedroom wall while Kendrick's kitchen wall is only partially adjacent, the other part being an external wall alongside its second covered porch. Oakridge has no second covered porch

**Dining**

- Oakridge has a sizeable and distinct dining area while Kendrick's dining area is noted as part of the family room and is given no independent dimensions on its plan
- Dining areas differ in location, size and shape
- Oakridge's dining area extends in a bay beyond the main line of the right wall while Kendrick's dining area has no bay. Oakridge's windows sit central to its bay with another window on the side of the bay while Kendrick's dining windows sit on the flat exterior left wall
- Oakridge has a cathedral ceiling sitting above its dining area while Kendrick does not
- Oakridge's dining area has a door from the outside of the property

**Sleeping spaces**

**Bedroom 1**

- Master bedrooms differ in size and shape with Oakridge at 13' x 13'8" and Kendrick at 12' x 13'
- Oakridge's master bedroom has a tray ceiling while Kendrick's does not
- Doors are differently located and configured
- Oakridge has no access to a walk in closet while Kendrick does

**Bedroom 2**

- Second bedrooms differ in size, shape and location. Oakridge is 11' x 12' and is located at the left back corner of the building while Kendrick is 10' x 10'6" and is located at the right back corner of the building
- Doors are differently configured
- Oakridge specifies no separate linen cupboard in hall while Kendrick does
- Oakridge has a vaulted ceiling while Kendrick does not

**Bedroom 3**

- Third bedrooms differ in location, shape and dimension. Oakridge is 11'4" x 12' while Kendrick is 10' x 10'6"
- Windows are differently located
- Oakridge closets and closet doors are differently configured from Kendrick's
- Oakridge has a vaulted ceiling while Kendrick does not

**Bathrooms**

**Bathroom 1**

- Oakridge has a walk in closet accessible from the master bathroom while Kendrick does not
- Oakridge has a window while Kendrick does not
- Appliances are differently configured: in Oakridge the bathtub is located on an internal wall while in Kendrick the bathtub is next to an external wall

**Bathroom 2**

- Second bathrooms and appliances are differently oriented

**Other spaces**

- Oakridge has one covered porch located at the front of the building. Kendrick has two covered porches: one at the front and one at the back
- Oakridge has an optional powder room while Kendrick does not
- Steps to basement are differently located and configured. Oakridge's staircase is single in direction while Kendrick's is L-shaped
- Doors to laundry areas are differently configured

12

# EXAMPLE 3

## Design Basics MODEL: 29324

**Name:** Womack

**Style:** Craftsman

**Description:**

Number of floor levels: 1.5

Number of bedrooms: 4

Number of bathrooms: 2

Number of garage stalls: 2

**Square footage:** 1,480

## LEXINGTON MODEL

**Name:** Easton

**Style:**

**Description:**

Number of floor levels: 2

Number of bedrooms: 4

Number of bathrooms: 2.5

Number of garage stalls: 2

**Square footage:** 2,108

## PRIMARY DIFFERENCES ON ELEVATION

**Roof**

- Easton's roof is differently configured than Womack's. Easton has a double gable on the left roof while Womack has a single gable

**Walls**

- Easton has a low stone wall along the front elevation while Womack has none

**Windows**

- Windows differ in number, design and location
- Easton has two seven-paned windows in it's front gable while Womack has a single bi-paned window in it's roof gable
- Easton has a second roof gable showing a small quad-paned window while Kendrick has none
- Easton has a triple seven-paned window on the left ground level while Womack has a double, bi-paned window on the left front ground level
- Easton has no window feature in its garage gable while Womack has a shuttered window feature centrally located on its garage gable

**Doors**

- Easton's front door is tri-paneled with no glass while Womack's front door has six panels and a vertical glass feature to the left of the door
- Easton's garage door differs in design from Womack's

**Decorative features**

- Easton has coach lamps flanking its garage door while Womack has none
- Easton has front columns of a cleaner and taller design than Womack's

**Materials**

- Easton uses vertical boards on its front gable and as a feature at the apex of its garage gable. Womack shows no vertical boards
- Easton's second left roof gable uses small shingles while Womack has no second gable on the left roof
- Easton uses siding on the bulk of its garage gable while Womack uses a large shingle

- Easton uses stone more extensively than Womack, notably on the low wall extending across the front of the building.
- Easton has no railings while Womack shows a wooden railing across the left front ground level of the building

## PRIMARY DIFFERENCES ON PLAN

### Garage/Parking
- Garages differ in size and shape.
- Easton is 583 square feet while Womack is 562 square feet
- Easton is almost square while Womack is oblong with a large rectangle cut out of the back left corner to house its laundry area
- Internal garage doors are configured differently
- Easton's garage has no designated storage area while Womack has a storage designated at the rear of the garage

### Living spaces

#### Family room
- Easton's family room differs from Womack's in dimension and configuration. Easton is 18' x 17'8" while Womack is 16' x 14'
- Easton's optional fireplace is located at the back left corner of the room, partially against the left exterior wall. Womack's standard fireplace is located on the internal back wall that separates the family room from the kitchen
- Windows are differently located with Easton's almost central to the front exterior wall and Womack's further to the left of its front exterior wall
- Easton's entryway from its family room to dining area is wider that Womack's entryway from its family room to eating area

15

- Womack specifies an entertainment area while Easton does not

### Kitchen

- Kitchens differ in dimension. Easton is 10' x 14' while Womack is 9'8" x 13'
- Easton shows double cabinet doors on its pantry while Womack has a single walk-in door

### Dining/Eating

- Easton's dining area differs in shape, dimension and configuration from Womack's eating area
- Easton is 12' x 14' while Womack is 10' x 12'
- Easton has no doors within the space while Womack has two doors

### Sleeping spaces

#### Bedroom 1

- Easton's master bedroom differs in shape, dimension and configuration from Womack's
- Easton is 13'8" x 14' while Womack is 13' x 12'
- Easton has two separate windows while Womack has a single window
- Doors are configured differently. Easton has a side-hung door from the master bedroom to bathroom while Womack has a sliding door
- Easton has a tray ceiling while Womack does not
- Easton has access to a large walk-in closet while Womack has no walk-in closet

#### Bedroom 2

- Second bedrooms differ in dimension, shape and configuration

16

- Easton is 12' x 11' while Womack is 10' x 10'
- Easton has a large walk-in closet with corner access. Womack has a small closet with front access

### Bedroom 3

- Third bedrooms differ in dimension, shape and configuration
- Easton is 12' x 11 while Womack is 10' x 10'
- Easton has a single, side-hung doored walk-in closet located in the left front corner. Womack's closet has double cabinet doors and is located at the right rear corner
- Windows are differently located

### Bedroom 4

- Fourth bedrooms differ in size, shape and configuration
- Easton is 12' x 12'6' while Womack is 10' x 10'
- Womack specifies a cathedral ceiling while Easton does not
- Easton has a large walk-in closet while Womack has no closet
- Access to Easton is by door to the bedroom space while access to Womack is through a corridor space past non walk-in storage

### Bathrooms

### Bathroom 1

- Master bathrooms differ in shape and configuration
- Easton's toilet is located against the rear exterior wall while Womack's is against the left interior wall
- Easton's washbasin is located against the rear exterior wall while Womack's is against the interior left wall.
- Easton has a closet while Womack does not

### Bathroom 2

- Second bathrooms differ in shape and amenities

17

- Easton's second bathroom is separated by a door from its twin washbasins while Womack's second bathroom incorporates a single washbasin
- Easton is a rectangle while Womack has a rectangular space cut out of its left front corner

**Other spaces**
- Easton has a full basement accessed by a stairway to the right of the family room while Womack has no basement and is built on slab
- Distribution of space on each story differs. Easton's first floor total area is 1290 square feet while Womack's is 940 square feet. Easton's upper level is 818 square feet while Womack's is 540 square feet.
- Womack specifies an optional computer desk on its upper level while Easton does not
- Womack has a walk-in laundry closet on its upper level while Easton does not
- Easton has two full bathrooms and an additional half bathroom on its first floor while Womack has only two full bathrooms
- Laundry areas are differently configured

18

# EXAMPLE 4

**Design Basics MODEL: 29524**

**Name:**        Taylor

**Style:**        Traditional

**Description:**

    Number of floor levels: 2

    Number of bedrooms: 3

    Number of bathrooms: 3

    Number of garage stalls: 2

**Square footage:** 1,297

---

**LEXINGTON MODEL**

**Name:**        Ashwood

**Style:**

**Description:**

    Number of floor levels: 2

    Number of bedrooms: 4

    Number of bathrooms: 2.5

    Number of garage stalls: 2

**Square footage:** 2,199

---

## PRIMARY DIFFERENCES ON ELEVATION

**Roof**

- Roofs are differently configured and oriented
- Ashwood's roof above its front entrance is continuous with its roof across its front ground level living space while Taylor's roof above its front

entrance is separately constructed and does not extend across the living
space

- Ashwood's roof above its living space is higher and extends above two
gables while Taylor's gables extend above its roofline

**Walls**

- Ashwood's garage wall sits forward of its front living space wall while
Taylor has one continuous wall extending across its entire front including
its garage
- Ashwood's walls are constructed of different materials than Taylor's (see
below: Materials)

**Windows**

- Most of Ashwood's windows are four-paned: three smaller panes above a
plain large pane. Taylor's windows have up to 30 panes per window
- Ashwood's window over its garage differs in shape and framing from
Taylor's. Ashwood's window is wide and shallow while Taylor's is deeper
with a gable and triangular eave feature
- The window on Ashwood's rear upper gable is differently shaped and
narrower than Taylor's

**Doors**

- Ashwood's front door has no glass while Taylor's has a multi-paneled, full-
length glass window to the left of its front door

**Decorative features**

- Ashwood's garage is flanked by coach lamps while Taylor has no coach
lamps
- Ashwood has three tapering columns that sit on stone supports while
Taylor has only two full-length straight columns that sit on its front
entrance space

- Ashwood has a covered front porch while Taylor has only a covered front entranceway

**Materials**

- Ashwood's ground level is faced largely with stone while Taylor's entire front is faced with standard siding
- Ashwood uses vertical siding over its front upper gable while Taylor uses standard siding
- Ashwood uses roofing material over its garage roof window while Taylor uses siding over its garage roof window
- Ashwood uses vertical siding around the top half of it's garage door while Taylor uses standard siding around its entire garage door

---

## PRIMARY DIFFERENCES ON PLAN

**Garage/Parking**

- Garages differ in size, shape and orientation. Ashwood is 589 square feet while Taylor is 504 square feet
- Ashwood has a long, narrow rectangular space cut out of its right side while Taylor is rectangle

**Living spaces**

### Family room

- Ashwood's family room is larger at 16' x 14'6" while Taylor is 14' x 13'
- Ashwood's fireplace is optional while Taylor's is standard

### Kitchen

- Ashwood's kitchen is different in size, shape and configuration to Taylor's
- Ashwood is 11' x 14'6" while Taylor is 10' x 10' 4"

21

- Ashwood has a walk-in pantry while Taylor has none
- Appliances are differently located. Ashwood's dishwasher is at a right-angle to its snack counter
- Ashwood's kitchen sinks are located against its rear exterior wall while Taylor's sinks are located across its rear right corner
- Ashwood's window is almost centered on its rear kitchen wall while Taylor's is on the rear right

### Dining
- Ashwood differs in size and shape to Taylor
- Ashwood is 12 x 14'6" rectangle while Taylor is a 10'4" x 10'4" square

## Sleeping spaces
### Bedroom 1
- Ashwood's master bedroom differs in size and configuration to Taylor
- Ashwood is 13' x 16' 6" while Taylor is 12'4' x 14'
- Ashwood has two windows, one located at the front and on the side of the building. Taylor has only one window located at the front
- Ashwood has three doors while Taylor has only two
- Ashwood has direct access to a walk-in closet while Taylor does not

### Bedroom 2
- Ashwood's second bedroom differs in size and shape from Taylor's. Ashwood is an 11' x 12' rectangle while Taylor is a 10' x 10" square
- Windows are differently located. Ashwood's single window is at the rear center while Taylor has one window at the rear right and another on the left exterior wall

**Bedroom 3**

- Ashwood's third bedroom differs in size and shape from Taylor's. Ashwood is an 11' x 12' rectangle while Taylor is a 10' x 10" square
- Windows are differently located. Ashwood's single window is at the rear center while Taylor's is at the rear left of the room

**Bathrooms**

### Bathroom 1

- Ashwood's Master Bathroom is differently configured to Taylor's
- Ashwood has a separate walk in shower and closet while Taylor has a bathtub
- Ashwood has no access to a walk-in closet while Taylor does

### Bathroom 2

- Ashwood's second bathroom has an arched soffit while Taylor's does not
- Ashwood has a closet while Taylor does not

### Bathroom 3

- Taylor specifies 3 total bathrooms but its plan shows 2 full bathrooms and a powder room on the ground level

**Other spaces**

- Ashwood's plan shows a bonus room/bedroom #4 on its upper level. This space is 23'6" x 14', has access to a walk-in closet, and has windows on its front and left sides
- Taylor's plan shows an unfinished storage space on its upper level of 353 square feet with no other dimensions provided. The space, unlike Ashwood's bonus room, has two windows to the rear and one to the front in a deep protruding alcove and has no walk-in closet.

23

- Ashwood has storage cabinets in its laundry areas while Taylor has none
- Ashwood specifies a tapered hall wall with wood cap while Taylor does not
- Ashwood has a covered porch while Taylor does not
- Ashwood has a window on its stairwell while Taylor does not

APPENDIX C

The generic layout and appearance of Design Basics' designs

Simple house designs, such as the layouts of Design Basics' Aspen, Womack, Taylor and Kendrick, contain a predictable, conventional array of rooms and spaces both in their use and juxtaposition, resulting in traditional residential appearances.

All four house designs conform to readily identifiable patterns in both plan and elevation which can be simply described in conceptual images, or 'bubble diagrams'. All of these are very common in the housing market:





Taylor



2.



Kendrick

While the diagrams describing the basic organizing principles and elements of each house display minor variations to each other, each will have many housing models that closely follow the same layout and appearance in the broader housing market that have generated countless comparable housing units over the years, often long before the advent of copyright protection.

The following images illustrate a range of similar plans and elevations of comparable housing units to one representative sample of the four Design Basics' units. All images are freely accessible on the web. While there are minor variations in specific sizes and details, they all conform to similar strategies of layout and appearance. None of the design examples shown contain any originality or creativity, and all use design elements in plan and elevation that are traditional and have been used in the housing industry for many years.'



Bubble diagram of basic floor plan



Conceptual diagram of basic house elevation



Design Basics



http://dehouss.com/simple-floor-plans-for-3-bedroom-house/perfect-simple-floor-plans-for-3-bedroom-house-on-floor-with-ft-ranch-house-plan-with-three-bedrooms-two-baths-fireplace-plan/



http://www.invernesshomesusa.com/home/home_designs/parms/1/d/31/greenhurst-ii.html



http://www.architecturaldesigns.com/hill-country-house-plan-36860jg.asp



http://withgood.co/small-2-bedroom-house-plans/excellent-small-2-bedroom-house-plans-with-three-bed-room-two-bath-traditional-single-level-house-plan-with-full/



http://www.monsterhouseplans.com/ranch-style-house-plans-1728-square-foot-home-1-story-3-bedroom-and-2-bath-2-garage-stalls-by-monster-house-plans-plan15-324.html



http://hdwallpaperszones.com/designing-a-house-in-revit-architecture/revit-architecture-house-download-and-design-your-dream-house-with-garage-and-kitchen-and-patio-and-dining-room-and-bedroom-and-foyer/



http://www.buildimmaculate.com/floorplans.html



http://www.buildimmaculate.com/floorplans.html



http://www.buildimmaculate.com/floorplans.html



http://www.menards.com/main/building-materials/books-building-plans/home-plans/one-story-homes/freeman-building-plans-only/p-1521722.htm



Built with an optional 3rd-car garage.

Design Basics



Design Basics



http://homeae.com/home-roof-trends-today-that-you-should-know/home-roof-ideas-2012



http://www.invernesshomesusa.com/home/home_designs/parms/1/d/31/greenhurst-ii.html



http://www.dreamhomesource.com/house-plans/dhs/collections/plans-with-3-bedrooms/dhsw076281.html



http://www.architecturaldesigns.com/european-house-plan-33052zr.asp



http://www.architecturaldesigns.com/european-house-plan-48312fm.asp



http://www.homeplans.com/house-plans/hp/homepw15558.html?from=search



https://www.frankbetz.com/plans/Lawson



Alvarezconstruction.com

# APPENDIX D: TRADITIONS OF DESIGN DEVELOPMENT IN THE HOMEBUILDING INDUSTRY

## APPENDIX D: Traditions of design development in the homebuilding industry

It is not surprising that there is such a similarity of styles in single family homes,

given the accepted practice of searching for acceptable housing ideas or 'best

practices' that has often been employed in the homebuilding industry. In the

absence of a strong architectural presence – most housing does not require or

involve an architect's expertize in the majority of states – the majority of design

work is undertaken by unlicensed personnel, many of whom have traditionally

referred to existing design solutions in the development of their housing units.

The practice of sharing freely available, pre-existing design ideas culled from

existing, traditional sources with clients to help them decide which design

features and options they would prefer is a widespread one. Materials on existing

homes may be gathered from books, magazines, websites, brochures and

potentially the marketing materials of competing designers, developers or

builders. These references may often be collected by prospective buyers to

share with their chosen builder to help explain their preferences and the kind of

home they would like. Homebuilding is a very competitive industry, and those

preparing plans refer to all manner of design sources to meet their client's

approval and provide them with a design they want. In the past, this 'sharing' of

ideas was considered normal practice and, even in the aftermath of the AWCPA,

there still exists a tradition of design by reference and reinterpretation of existing

ideas.

It is reportedly quite common for discussions between homebuilders, developers

or contractors and their clients to include reference to a variety of information

sources that may include magazines, photographs or websites that contain freely

accessible design ideas of a general, schematic nature. In order to satisfy the

needs of their clients, housing designers may assemble rudimentary ideas from a

number of such sources, including their own inventory of design solutions, and

then rework them into a new design format for new clients, refining their work

before creating the working drawings necessary for construction.

This free flow of traditional, pre-existing ideas, which inevitably leads to similarity

rather than variety in the housing stock, has a long history of use and has, in fact,

some accepted value. Even architects as creative and original as Frank Lloyd

3

Wright had once advocated for the reinterpretation and reuse of existing building language. Wright even developed a pattern book which contained suggested design component alternatives which he freely offered to the public, which was published in journals in the early part of the Twentieth Century.

Furthermore, both the teaching and practice of architecture stress the need to learn from the past, to respond to the prevailing site conditions and not to re-invent the wheel for the sake of novelty in each new project. The design of a new building is rarely a unique achievement, but a further manipulation and reinterpretation of an existing architectural language within a new context. Contextualism, the art of 'fitting in' with an existing built environment, actually advocates the reuse of an existing palette of materials and forms in certain circumstances (such as a historically significant area). Such a strategy prevents random, visual chaos in the built environment and has long been a tradition in the architectural profession, seen clearly in the stylistic insistence for conformity of houses in such historic settlements as Williamsburg or Cape Cod.

# APPENDIX E: RECENT DEVELOPMENTS IN COPYRIGHT PROTECTION

## APPENDIX E: Recent developments in copyright protection

The use of traditional ideas that are pre-existing and prevalent in the built environment has not hitherto been questioned in the homebuilding industry until the enactment of the Architectural Works Copyright Protection Act. While the Act provided valuable protection of architectural ideas not previously available to their creators, it has led to unforeseen consequences not apparently anticipatable in the drafting of the Act. Ironically, copyright cases that have been decided in the United States since its enactment have involved relatively few architects, the group whose creative work the Act primarily sought to protect. Instead, it is apparent that the provisions of the Act have been invoked by a number of homebuilding companies who have aggressively attempted to either protect their market share or create an exclusive right by preventing their competitors from using their own, similar designs which do not benefit from comparable copyright protection. By promptly registering their designs for copyright protection, claiming originality and no previous design sources, some companies have even expanded their quest for market control and compensation by matching their works to other homebuilder's portfolios of work, often far beyond their possible market reach (and in some cases, in distant states) and

2

then suing them for copyright infringement. This anti-competitive conduct is, I believe, an unexpected and unintended consequence of the copyright protection and is, in my opinion, a misuse of the Act.

In reality, the notion that housing solutions that have long existed across the country, all of which conform to conventional, traditional and therefore similar designs have originated from a relatively recently copyrighted group of designs in one American city is remote. The majority of these homes, including the Design Basics models listed in the Complaint, share a vocabulary that has been developed from a wide range of pre-existing, traditional sources which were generated long before the copyright registration and the creation of the AWCPA.